1

1        IN THE UNITED STATES DISTRICT COURT

2           FOR THE DISTRICT OF COLORADO

3    Case No. 11-cr-00188-JLK

4    ═══════════════════════════════════════════════════

5    UNITED STATES OF AMERICA,

6         Plaintiff,

7    vs.

8    LESLIE RENEE HEE,

9         Defendant.

10   ═══════════════════════════════════════════════════

11        Proceedings before KATHLEEN M. TAFOYA, United

12   States Magistrate Judge, United States District Court for

13   the District of Colorado, commencing at 10:21 a.m., May 31,

14   2011, in the United States Courthouse, Denver, Colorado.

15   ═══════════════════════════════════════════════════

16        WHEREUPON, THE ELECTRONICALLY RECORDED PROCEEDINGS

17   ARE HEREIN TYPOGRAPHICALLY TRANSCRIBED...

18   ═══════════════════════════════════════════════════

19               APPEARANCES

20        M.J. MENENDEZ, Assistant United States Attorney,

21   appearing for the government.

22        WILL SMITH, Attorney at Law, appearing for the

23   defendant.

24   ═══════════════════════════════════════════════════

25            DISCOVERY AND DETENTION HEARING


AVERY/WOODS REPORTING SERVICE, INC.
455 SHERMAN STREET, SUITE 250, DENVER, CO  80203
303-825-6119      FAX 303-893-8305

1                    P R O C E E D I N G S

2              (Whereupon, the within electronically recorded

3        proceedings are herein transcribed, pursuant to order of

4        counsel.)

5              THE COURT: All right, the next matter is United

6        States of America versus Leslie Renee Hee.  That case number

7        is 11-cr-188.  May I have appearances.

8              MS. MENENDEZ: Good morning, Your Honor, my name is

9        M.J. Menendez, and I appear on behalf of the United States.

10       With me at counsel table is Special Agent Tyler Brown from

11       the Drug Enforcement Administration.

12             THE COURT: All right.  Good morning.

13             MR. SMITH: Good morning, Your Honor, I'm Will

14       Smith, I'm appearing here with Ms. Leslie Hee who is present

15       to my right in custody.

16             THE COURT: All right.  The docket here says that

17       we are here for a discovery conference and a detention

18       hearing.  Do you have the paperwork for the discovery

19       conference, or --

20             MS. MENENDEZ: Your Honor, I believed that we had

21       done that, and I believed erroneously, so maybe I can get a

22       blank one and we can take care of things that way.  And I

23       apologize to you, I brought it twice.

24             THE COURT: I can look it up, make sure.

25             MS. MENENDEZ: No, I (inaudible).  My apologies to

1      the Court and to counsel.

2                  (Pause in the proceedings.)

3                  MS. MENENDEZ: Your Honor, may I approach?

4                  THE COURT: Yes.

5                  MS. MENENDEZ: Again, I'm sorry for the delay.

6                  Thank you, Your Honor.

7                  THE COURT: All right, I do now have the discovery

8      conference memorandum and order in front of me.  My role

9      here is to give you your speedy trial dates.  The 30-day is

10     June 10, 2011, the 70-day is July 16, 2011, and the 90-day,

11     if it's needed, is August 5th, 2011.

12                  It looks like you should have gotten some

13     discovery today.  Did you, Mr. Smith?

14                  MR. SMITH: I certainly have received a packet of

15     discovery about a week ago.

16                  THE COURT: Oh, all right.  All right.  When can

17     you do your reciprocal discovery?

18                  MR. SMITH: 30 days should be sufficient from

19     today.

20                  THE COURT: All right, so we'll put June 30.

21                  Are there dates set in this case already since

22     there's a co-defendant?

23                  MS. MENENDEZ: There are dates set, Your Honor.

24     There is a trial date set in July, there are motions to

25     exclude time that have been filed that the government has no

1   objection to.

2           THE COURT: All right.  So have you had a chance to

3   look at the docket and see where you stand, Mr. Smith, in

4   the case?

5           MR. SMITH: Yes, we will be filing a motion to

6   exclude time as well.  I anticipate it will be granted.

7           THE COURT: All right.  All right, I filled in the

8   case number here.  Is this Judge Kane?

9           MS. MENENDEZ: Yes, Your Honor.  And we had a

10  conference call a week ago with all counsel that -- for all

11  accounted four parties on it.

12          THE COURT: All right.

13          Okay, that leaves us with the issue of bond or

14  detention.  What's the government's position?

15          MS. MENENDEZ: The government is seeking detention.

16          THE COURT: All right.  And Mr. Smith?

17          MR. SMITH: Your Honor, we're seeking bond.  We are

18  moving for release conditions consistent with what was

19  recommended in the pretrial services report.

20          THE COURT: All right.  As I understand it, that

21  was home detention with GPS monitoring?

22          MR. SMITH: Yes, and drug treatment, in-house or

23  out-house, as necessary or recommended.  There were actually

24  11 conditions.

25          THE COURT: All right.  How do you wish to proceed?

1           MS. MENENDEZ: Your Honor, we are going to call one

2      witness to the stand, but as a preliminary matter, Mr. Smith

3      filed a document yesterday at --

4           MR. SMITH: Very late.

5           MS.   MENENDEZ:  I've  lost  time,  but  it  was

6      yesterday.  It's a four-page defendant's motion and proffer

7      for pretrial release.  I have reviewed it.  I could tender

8      my copy to the Court except I do not have the exhibit that

9      came --

10          THE COURT: I have it.

11          MS. MENENDEZ: Okay.

12          THE COURT: I don't have the exhibit, though.

13          MR. SMITH: I have copies.  If I may?

14          THE COURT: Okay, that would be good.

15          MS. MENENDEZ: Oh, thank you.

16          MR. SMITH: Sure.

17          May I approach, Your Honor?

18          THE COURT: Yes.  Thank you.

19          All right, I'm going to attach that exhibit to the

20     back of the copy that I have.  I saw it on the record this

21     morning, so I don't know why it didn't print the exhibit.

22          You can go forward.

23          MS. MENENDEZ: The government calls Special Agent

24     Tyler Brown to the stand, please.

25

```
 1          GOVERNMENT WITNESS, SPECIAL AGENT TYLER BROWN, SWORN
 2              THE COURT: Have a seat and state your full name
 3      for the record and spell your last name, please.
 4              THE WITNESS: My name is Special Agent Tyler Brown,
 5      B-R-O-W-N.
 6              MS. MENENDEZ: May I inquire, Your Honor?
 7              THE COURT: Yes.
 8              MS. MENENDEZ: Thank you, Your Honor.
 9                      DIRECT EXAMINATION
10      BY MS. MENENDEZ:
11      Q    Sir, what do you do for a living?
12      A    I'm a special agent with the Drug Enforcement
13      Administration.
14      Q    How long have you worked in that capacity?
15      A    Approximately two years, and prior to that I was a
16      diversion   investigator   with   the   Drug   Enforcement
17      Administration for approximately four years.
18      Q    And, sir, what is a diversion investigator?
19      A    A diversion investigator conducts criminal, civil,
20      and regulatory investigations involving the diversion of
21      controlled  substances  to  illicit  markets.   In  basic
22      language, I do pill cases.
23      Q    Agent Brown, what brings you here today?
24      A    In regards to the investigation of Leslie Hee.
25      Q    And what is your role in that investigation?
```

7

1    A    I'm currently the case agent for DEA.

2    Q    As case agent, what do you do?  What does that mean?

3    A    Essentially you coordinate all the tasks involving the

4    investigation, manpower, and where to take the case based on

5    the evidence we receive throughout the investigation.

6    Q    Agent Brown, did you begin this investigation?

7    A    I did not.  The investigation was begun by the Denver

8    police and the Bureau of Alcohol, Tobacco and Firearms, and

9    they initiated that investigation into Leslie Hee roughly

10   April of 2008.

11   Q    And who from the DEA was responsible at that time?

12   A    Around May of 2008, receiving information from Denver

13   police, Diversion Investigator Brian Bruce (phonetic) was

14   the case agent.

15   Q    When did you take the case over?

16   A    Roughly the fall of 2009.

17   Q    And why did you take the case over?

18   A    Diversion Investigator Bruce was transferred to another

19   division.

20   Q    And he's doing -- he's still with the DEA in good

21   standing, correct?

22   A    Correct, still with the DEA out of our office of

23   training.

24   Q    Okay.  And how did you get up to speed on the case,

25   sir?

1   A    By speaking with Investigator Bruce before he left,

2   and also review of the reports.

3   Q    All right.  Can you tell the Court, please, the nature

4   of the investigation.

5   A    Yes.  Again, roughly April of 2008, ATF and DPD were

6   conducting    investigations    into    Michael    Hee,    which

7   subsequently led them, based on surveillance and so forth,

8   to the defendant, Leslie Hee, and they essentially found out

9   that she -- she was running a prescription drug trafficking

10  organization.

11  Q    And what did -- generally, an overview of the

12  investigation.  What  --  how  did  this  drug  trafficking

13  organization work?

14  A    Well, based on review of the reports and in speaking to

15  DI Bruce, essentially Leslie Hee would recruit young twenty-

16  somethings into her organization by getting them addicted to

17  pain pills and sending them to doctors to obtain more pain

18  pills, namely Oxycontin, Oxycodone products, Fentanyl, and

19  then she would distribute those for sale.

20  Q    And when you say that she would get people addicted,

21  did  you  learn  through  the  course  of  the  investigation,

22  through the reports of others what mechanism she used?

23  A    Yes, she would essentially -- specifically with one

24  case she would offer work, employment, they could live with

25  her, they could use her vehicles and so forth.

1    Q    So beginning in April of 2008, what -- how did the

2    investigation come to the ground at that time, if you will?

3    A    Well, Denver police were on surveillance in regards to

4    the Michael Hee investigation, and they -- allow me to refer

5    to the report for one second, please.

6    Q    Let's clear up the record here.  What are you looking

7    at?

8    A    This is the case synopsis of the entire case, basically

9    the Leslie Hee drug trafficking organization done by DI

10   Bruce.

11   Q    Okay.  And how -- is that a synopsis of --

12   A    It's just a basic synopsis, pulling information from

13   reports and conversations with other agents involved.

14   Q    How many times in the course of this investigation have

15   you had occasion to review that document?

16   A    I've had several occasions.

17   Q    And do you know that the information in there is

18   correct to the best of your information and belief?

19   A    Yes.

20   Q    Would referring to that document help you refresh your

21   recollection?

22   A    Yes, ma'am.

23   Q    Okay.  Go ahead, sir.

24   A    Based on a suspected drug transaction that Denver

25   police observed, they made a traffic stop of an individual,

1    and subsequently he was arrested and interviewed regarding

2    where he was coming from and what he was doing, and

3    essentially all the information he provided confirmed the

4    suspicions that that was a drug transaction, and the

5    individual essentially laid out the Leslie Hee organization

6    as far as how they operate, you know, recruiting individuals

7    and obtaining large quantities of prescription drugs.

8    Q    Shortly thereafter in April of 2008, did undercover

9    investigations take place directly with Ms. Hee?

10   A    Correct.  Upon DEA learning about the investigation,

11   we utilized a task force officer who was Denver police but

12   sworn in with DEA, and he essentially was introduced by the

13   individual that was -- that was arrested initially by Denver

14   police, introduced to Leslie and other members of the

15   organization, and he began making undercover buys.

16   Q    And have you had a chance to review the indictment?

17   A    Yes, ma'am.

18   Q    Okay.  And there are a number of counts that date from

19   April 29 to August of 2008, and I'm just going to ask you

20   some general questions about those counts.

21           In the vast majority of those counts, if not all

22   of those counts, who -- what did those transactions consist

23   of?

24   A    Well, there were several controlled substances

25   involved, but primarily it was the prescription drugs as

1    mentioned before, the Oxycontin, the Fentanyl, but there was

2    also cocaine, Ecstasy, and marijuana as well.

3    Q    Who had the drugs?

4    A    Primarily most of the controlled buys were done with

5    Leslie Hee being the person distributing them.

6    Q    And were many of them recorded?

7    A    Yes.  Yes, ma'am.

8    Q    Were there surveillance for many of them?

9    A    Yes, ma'am.

10   Q    And in those transactions, are they hand-to-hand

11   between an undercover police officer and Leslie Hee largely?

12   A    Yes, ma'am.

13   Q    Okay.  Now, when the drug trafficking ring started,

14   were the -- let me withdraw and rephrase, Your Honor.

15         As time passed, April to August of 2008, did the

16   amounts of narcotics traffic change?

17   A    Yes, ma'am, they did.  They began increasing.

18   Q    And between April and August of 2008, a number of the

19   counts that went on -- that took place were in the vicinity

20   of a particular place, Agent Brown?  Not a great question,

21   but I think you get it.

22   A    Yeah, there were several counts included in the

23   indictment   that   were   very   close   to   a   school,   which

24   essentially fit the statute for the indictment, essentially

25   right across the street from West High School.

1       Q     And in any of those transactions, did the DEA push to

2       have the transaction there, or was it Ms. Hee's idea?

3       A     No, ma'am.  No, ma'am, it was Ms. Hee's idea.

4       Q     Okay.  In August of 2008, August 5 of -- well, let me

5       stop there, let me go back a little bit.

6                   July of 2008, was there an incident involving Ms.

7       Hee and different law enforcement than the DPD?

8       A     Correct.  In July of 2008, unbeknownst to DEA, West

9       Metro Drug Task Force conducted two undercover buys by

10      utilization of a confidential source, and she was -- Leslie

11      Hee was arrested on the second undercover buy.

12      Q     Do you know if Ms. Hee made a statement?

13      A     Yes, she did.  After being advised of her Miranda

14      rights  and  waiving  those  rights,  Detective  Bellamy

15      (phonetic), based on the review of his report, Leslie Hee

16      made a statement that she was in fact -- she did in fact

17      sell those pills to the confidential source.

18      Q     Okay, and that was -- she was arrested along about July

19      28, July 29?

20      A     Based on the reports, mid July, late July.

21      Q     Okay.  What happened on August 5, 2009?

22      A     August 5, 2008 --

23      Q     I'm sorry, thank you.  We're in 2008 all the way

24      across the board, and I misspoke, correct?

25      A     Yes, ma'am.

1    Q    Thank you, sir.  Go.

2    A    Yeah, August 5, 2008, again, the same task force

3    officer  sworn  in  with  DEA  conducted  another  undercover

4    purchase from Leslie Hee, it was for approximately $5,000

5    worth of Oxycontin tablets.

6    Q    And what happened on August 9?

7    A    August 9th was very similar to August 5th, it was

8    another $5,000 undercover purchase.

9    Q    I'm going to take you to August 22 of 2008, and I

10   want you to talk to me about a transaction that happened on

11   that day, if there was one that happened at all.

12   A    I'm sorry, ma'am.  August 23rd --

13   Q    Excuse me, October 22, 2008.

14   A    October 20th, I believe, ma'am, based on the reports.

15   Q    October 20.  Thank you, sir.

16   A    Yes, on October 20th the same task force officer that

17   had been doing undercover into Leslie Hee arranged to meet

18   with her, because it had been a little over a month I

19   believe that she -- they hadn't had much contact and hadn't

20   done an undercover purchase, so he -- the task force officer

21   arranged to meet with Leslie Hee, and when he met with her

22   it was to discuss further drug transactions.  And when he

23   finally meets with her, he gets in the car, Leslie Hee's

24   car, it was a dark-colored SUV, and as soon as he gets in

25   the  car  a  younger  individual,  twenty-something,  who

1    identifies herself as Anna, also enters the vehicle in the

2    back seat, the task force officer was in the front passenger

3    seat.

4           The task force officer is discussing things with

5    Leslie, and the female identified as Anna, which we later

6    identified to be Anna Wenter, also indicted under this case,

7    she made a statement that she was very upset because her

8    friend, Katina Phillips, had overdosed a couple days before

9    that.  And based on autopsy reports, it was about October

10   16th, four -- four days prior to that undercover operation,

11   and she made a statement that she was upset because Katina

12   Phillips was a young, young woman that had two young

13   children, pretty gal, and she was very devastated by the

14   overdose.

15   Q    Was it just an overdose, or did something else happen

16   as a result of it?

17   A    She was -- she was discovered in the bathtub, so I

18   believe the official cause of death of accidental drowning,

19   but there were indications in the autopsy report of an

20   overdose being a contributing factor due to Oxycontin,

21   cocaine, and Ecstasy.

22   Q    And did Ms. Wenter say anything else in that

23   conversation in the car where Leslie Hee was present?

24          MR. SMITH: Your Honor, I object to Ms. Wenter's

25   statements and fail to see the relevancy to the issues

1    before us today.  On this entire line of questioning, for

2    that matter.

3             THE COURT: Ms. Wenter is a co-defendant, right?

4             MS. MENENDEZ: Yes, Your Honor.

5             THE COURT: Overruled.

6    A    Well, Ms. Wenter stated that Katina had overdosed on

7    cocaine, Ecstasy, and Oxycontin.  And she stated that --

8    excuse me, one second to refer to my report.

9    Q    (By Ms. Menendez) Please.  And it's not your report,

10   is it, sir?

11   A    Oh, I'm sorry.  Yeah, correction, not my report, it's

12   the task force officer that conducted undercover, it's his

13   report.

14   Q    And your testimony today is based on what you have

15   gleaned in the investigation, not personal -- you weren't

16   there, correct?

17   A    Correct, I wasn't here during 2008, I wasn't assigned

18   to this office.

19   Q    Okay, go ahead.

20   A    Additionally, Anna made a statement that she was

21   worried because Katina's boyfriend, husband -- I'm not real

22   clear as to whether -- what the relationship was, but had

23   stated to Anna that he was going to denounce the entire drug

24   ring and basically turn everything over to the police

25   because he was so devastated about Katina's death.

1   Q    Okay.  And what else happened during that particular
2   episode in the car?
3   A    Anna and Leslie Hee continued with a drug transaction.
4   She said essentially they wanted -- that Anna wanted to
5   purchase four Oxycontin 40-milligram tablets and Leslie Hee
6   handed her the tablets and Anna and Leslie made the
7   arrangement that they would settle the price and so forth at
8   the house.
9   Q    In the investigation after this October 20 incident,
10  was there any investigation done to see whether Katina
11  Phillips had any link to any of the charged co-defendants in
12  this case?
13  A    Yes, there was.
14  Q    And can you describe it?
15  A    After reviewing the autopsy reports and identifying who
16  Katina was, they also ran prescription drug information.
17  Q    I'm going to -- I asked you a bad question, let me go
18  another way.
19       Andy Green, who is she?  Andrea Green?
20  A    That is Katina Phillips' sister.
21  Q    And did she give information to folks that indicated
22  that Katina Phillips was friends with Ali Wilfley and Anna
23  Wenter?
24  A    Yes.  Yes, she did.
25  Q    Okay.  I am going to go now, sir, to the summer of

1    2009.   Have we recently obtained some information about

2    Leslie Hee's activities in the summer of 2009?

3    A    Yes, ma'am.

4    Q    And when was that?

5    A    That was approximately May 5th of this year, 2011.

6    Q    And where were you when you got this information?

7    A    We're at the federal courthouse, it was actually for

8    the detention hearings of several defendants in this case.

9    Q    One of whom was Eleanor -- Eleanor "Ali" Wilfley?

10   A    Correct.

11   Q    Who did you receive this information from?

12   A    Eleanor's known to in the investigation by us as

13   Ali.   Ali's parents, Jolene Wilfley and Max Young.

14   Q    And was -- just for the purposes of our record, this

15   was in the presence of Ali Wilfley's attorney, correct?

16   A    Correct.

17   Q    Okay.  And Jolene Wilfley and Max Wilfley, are they in

18   the courtroom here today?

19   A    Yes, ma'am, they are.

20   Q    Where are they?

21   A    They're at the back of the courtroom right there.

22   Q    Did they report an incident involving their daughter

23   in the summer of 2009?

24   A    Yes, they did.

25   Q    Would you please describe it for the Court.

1    A     They stated in the summer of 2009 they woke up like any

2    other morning, started going through their routine, and they

3    discovered Ali in the backyard.  They went out to see why

4    she was there, because to their knowledge she was living

5    with Leslie Hee.  They go out to see what the situation was,

6    and she was lying in the fetal position, essentially

7    unconscious, unresponsive.

8    Q     And did they notice anything about her head?

9    A     Yes, her -- well, she was unresponsive and her head was

10   just laying there and there was drool coming out of her

11   mouth.

12   Q     Okay.  What did they do next?

13   A     They brought her into the house.  They -- they stated

14   that they assumed right away that it was --

15         MR. SMITH: Your Honor, may I object?  A hearsay

16   based upon an assumption, while I understand the Rules of

17   Evidence don't technically apply, I think that's not worthy

18   of consideration in this hearing.

19         THE COURT: We're talking about things that were

20   said by the parents of a co-defendant.

21         THE WITNESS: Yes, ma'am.

22         THE COURT: And where -- how did you happen to hear

23   the things said by the parents?

24         THE WITNESS: I was interviewing them.

25         THE COURT: And was that in May of 2011?

1          THE WITNESS: Yes, ma'am.

2          THE COURT: Overruled.

3     Q    (By Ms. Menendez) Go ahead, sir.  You were talking

4     about  when  the  parents  encountered  Ms.  Wilfley  in  the

5     backyard.

6     A    Yes, they -- they had assumed it was a drug overdose

7     immediately upon discovering her because they had knowledge

8     of Ali, and, you know, living with Leslie Hee and involved

9     in a drug trafficking organization.  So they immediately --

10    that was their immediate thought.  They brought her into the

11    house,  kind  of  set  her  up,  and,  again,  she  was  very

12    unresponsive and the just the drool going down her chin, and

13    she was subsequently taken to the emergency room.

14    Q    Did she -- was she making any statements once they got

15    her into the house?

16    A    Yes, she did -- Ali made a statement that she had told

17    Leslie not to take to her parents' house.

18    Q    And did she say that -- was this a coherent

19    conversation as Mr. and Mrs. Wilfley told it to us?  Or

20    characterize it, what are they telling us?

21    A    No, I mean, she was still very, very much out of it,

22    and so at that time that statement, even though it was made,

23    was somewhat incoherent.

24    Q    And did she say it once, or did she keep repeating it?

25    A    She was repeating it several times.

1     Q     Okay.  And what did her parents -- what did Mr. and

2     Mrs. Wilfley do with Ali at that time?

3     A     Well, they took her to the hospital to the emergency

4     room.

5     Q     And which hospital?

6     A     Swedish Hospital.

7     Q     Do you know how long she was there?

8     A     I believe they kept her overnight.

9     Q     And during -- at any time during this episode, did Ms.

10    Wilfley say that -- did she ever renounce her statements

11    that Leslie Hee dropped her off?

12    A     No.  After that, after she came out of the hospital

13    she -- again, when she was in a more normal state, she moved

14    back in with her parents and told her father several times

15    that Leslie was the person -- and other people involved in

16    this trafficking organization had dumped her in the backyard

17    that night.

18    Q     And you said previously that Ms. Wilfley had been

19    living with Ms. Hee.  Did that arrangement come to an end,

20    and how do you know that?

21    A     Yes, the -- that same day when the parents were back at

22    the house, the doorbell rang, the father, Max, went to the

23    door and there was a man standing there with a pile of Ali's

24    property.  Clothes, a watch that he recognized to be Ali's,

25    and the man essentially handed that over and went back to

1    his vehicle and left.  Max stated that the vehicle he saw

2    that day that the man was driving was a dark SUV, and he had

3    recognized that vehicle to be one that Ali had utilized

4    during her alleged employment with Leslie Hee, and also he

5    had seen Leslie Hee driving that vehicle as well.

6    Q    And for the purposes of our record, is it possible that

7    it was Mr. Wilfley's watch and not Ali's?

8    A    Yes.   Correction, yes, it was --

9    Q    Okay.

10   A    -- Mr. Wilfley's watch.

11   Q    All right.  And when -- when is the last transaction

12   that is charged with Ms. Hee?  When is the last criminal

13   activity on the street?

14   A    November of 2010.

15   Q    Did Mr. Wilfley give us any information about -- any

16   additional information about how Ms. Hee got her clients?

17   A    Yes, he stated -- Max stated that Leslie Hee would go

18   and be a counselor of some type at drug rehab -- at a drug

19   rehab facility near his house and would recruit young

20   individuals into her organization because she knew that they

21   were addicted.

22          MS. MENENDEZ: Your Honor, no further questions.

23   Thank you.

24          THE COURT: All right.  Cross-examination?

25          MR. SMITH: Yes, thank you, Your Honor, if I may.

AVERY/WOODS REPORTING SERVICE, INC.
455 SHERMAN STREET, SUITE 250, DENVER, CO  80203
303-825-6119      FAX 303-893-8305

```
 1                     CROSS-EXAMINATION
 2    BY MR. SMITH:
 3    Q    Good morning.
 4    A    Good morning.
 5    Q    Sir, you gave an opinion that -- about a pattern
 6    alleged where Leslie Hee employed people, got them addicted,
 7    and then sold them drugs, correct?
 8    A    Yes.
 9    Q    What's the source of that information?
10    A    That's through the investigation, through interviews of
11    witnesses like Ali's parents and --
12    Q    So --
13    A    -- other reports.
14    Q    -- you got that from Ali's parents?
15    A    That was one of the sources.
16    Q    And what is another source?
17    A    Through the reports of investigation.
18    Q    Well, these reports of investigations have to have
19    sources, right?
20    A    Yes.
21    Q    And what are those sources?
22    A    Agents' interviews, our undercover purchases, things
23    that occurred during those purchases.
24    Q    So the agents' interviews.  The agents who make the
25    interviews, they don't have first-hand knowledge of these
```

1      facts, do they?

2      A    Well, the task force officer involved in the case did

3      because he was doing undercover.

4      Q    Okay.  And was the task force officer working for Ms.

5      Hee in the sense of he was recruited and worked in her

6      house?

7      A    No.

8      Q    Was the task force agent lulled into addiction by Ms.

9      Hee?

10     A    No.

11     Q    So who was it that -- who actually has first-hand

12     knowledge about what you claim about how she lured people

13     in, got them addicted and gave them work?

14     A    Well, specifically it will be Ali based on the

15     interview with her parents.

16     Q    Have you interviewed Ali?

17     A    Not yet.

18     Q    Okay, so you don't have any direct information from

19     Ali?

20     A    No, we do not.

21     Q    And Ali, in fact, is a co-defendant in this case, isn't

22     she?

23     A    Correct.

24     Q    In fact, she's number two on the list, isn't she?

25     A    I don't know what her number is, sir.

24

1     Q     And she's facing charges in this case?

2     A     Yes.

3     Q     Criminal penalties in this case?

4     A     Yes.

5     Q     And so she and her parents might have a motive to cast

6     the blame on somebody else, isn't that true?

7     A     I can't presume their opinion, sir.

8     Q     Now, I think you testified that in a number of these

9     undercover drug transactions where Ms. Hee was in her car,

10    I think you said she was in most of those, is that correct?

11    A     The majority, yes, sir.

12    Q     Isn't it true that also in several of these drug

13    purchase cases in the car, Ali, or Eleanor Wilfley, was in

14    the car as well?

15    A     Yes.

16    Q     And she was involved in those purchases?

17    A     Yes.

18    Q     And I think you said that Ms. Hee actually admitted to

19    officers in -- was it July 2008 when she admitted to

20    officers that she was engaged in this prescription drug

21    activity?

22    A     Yes.

23    Q     And she was arrested?

24    A     Yes, she was arrested but released pending cooperation.

25    Q     Okay, pending cooperation.  Her as an informant helping

1    the police?

2    A    That's my understanding based on discussions with the

3    West Metro officer, yes.

4    Q    And she remained on the street until at least after

5    2010, is that correct?

6    A    Yes.

7    Q    And various and sundry police agencies, West Metro

8    being one, continued to investigate her?

9    A    Correct.

10   Q    Continued to do undercover buys with her?

11   A    Yes.

12   Q    And you mentioned a buy near a school.  That was

13   actually with an undercover officer?

14   A    Yes.

15   Q    So the undercover officer didn't stop that buy to

16   prevent it from happening near a school, did he?

17   A    No.

18   Q    He was okay with just going ahead and making that

19   transaction near the school?

20   A    Yep.

21   Q    And you don't have any evidence, direct evidence that

22   you saw that she was selling drugs to the school children,

23   was she?

24   A    No.

25   Q    You mention this incident with Ms. Wilfley where she

1    was incoherent from a drug overdose, correct?

2    A    Yes.

3    Q    And this was relayed to you by Ms. Wilfley's parents,

4    correct?

5    A    Yes.

6    Q    And Ms. Wilfley, she herself remains a defendant in

7    this case, correct?

8    A    Yes.

9    Q    And to your knowledge the only people there with first-

10   hand knowledge of that would be Ms. Wilfley and her parents,

11   right?

12   A    Yes.

13   Q    And the only people you've actually talked to about it

14   is Ms. Wilfley's parents?

15   A    Thus far, yes.

16   Q    And the parents relay to you that she was discovered

17   in the backyard, right?

18   A    Yes.

19   Q    You don't have any information that anyone else was in

20   the backyard when she was discovered, do you?

21   A    No.

22   Q    And certainly there's no information that Ms. Hee was

23   there, correct?

24   A    Correct.

25   Q    And we have no information that would establish what

1    time Ms. Wilfley had arrived that evening.

2    A    Sometime before they -- or after they went to bed and

3    before they got up that morning.

4    Q    Right, but we don't have any information that would

5    establish specifically what time she arrived?

6    A    No, sir.

7              MR. SMITH: Thank you.  No further questions.

8                      REDIRECT EXAMINATION

9    BY MS. MENENDEZ:

10   Q    Are you familiar with the name Daniel Laurence?

11   A    Yes, ma'am.

12   Q    Who is he?

13   A    He is a defendant in this case as well.

14   Q    February of 2009, did law enforcement have a contact

15   with Daniel Laurence?

16   A    Yes, they did.

17   Q    And what did he say about Leslie Hee and her drug

18   organization?

19   A    Very similar to other individual statements,

20   specifically Ali's, that mostly he recruits individuals and

21   uses them to go to doctors and get more pills and sell those

22   pills.

23   Q    How about Joslyn Torres, does that name ring a bell?

24   A    Yes, ma'am.

25   Q    And did she give a statement to law enforcement on one

1    of her arrests?

2    A    Yes, she did.

3    Q    Did she confirm the information that was given by the

4    various people and the information about Leslie Hee's

5    tactics?

6    A    Yes, ma'am --

7    Q    No --

8    A    -- very similar.

9              MS. MENENDEZ: No further questions.

10             MR. SMITH: May I, Your Honor?

11             THE COURT: Yes, go ahead.

12                        RECROSS-EXAMINATION

13   BY MR. SMITH:

14   Q    So Daniel Laurence is a defendant in the case?

15   A    Yes, sir.

16   Q    So he has an interest in the outcome?

17   A    I can't assume his interests, sir.

18   Q    He has a potential for being convicted of a felony,

19   right?

20   A    Yes.

21   Q    And if he's convicted he would be punished, correct?

22   A    Yes.

23   Q    And Joslyn, what, same thing, a defendant in this case?

24   A    Yes.

25   Q    And she has a potential of being convicted, correct?

1      A     Yes.

2      Q     And she has a potential of being punished?

3      A     Yes.

4             MR. SMITH: Thank you.  No further questions.

5             THE COURT: How old was Anna in October of 2008?

6             THE WITNESS: Approximately early 20s, ma'am.

7             THE COURT: Early 20s?

8             THE WITNESS: Yes, ma'am.

9             THE COURT: How about Ali in 2009?  The summer of

10     2009, how old was she?

11            THE WITNESS: Very similar, in her 20s, ma'am.  I

12     don't have that --

13            THE COURT: Are we talking 28, 29?  Are we talking

14     21, 22?

15            THE WITNESS: I believe approximately mid 20s.

16            THE COURT: Mid, okay.

17            Any  other  questions  based  on  the  Court's

18     questions?

19            MS. MENENDEZ: None  from  the  government,  Your

20     Honor.

21            MR. SMITH: None from defense, Your Honor.

22            THE  COURT:  All  right.   May  this  witness  be

23     excused?

24            MS. MENENDEZ: Yes, Your Honor.

25            MR. SMITH: Yes, Your Honor.

1                    THE COURT: All right, you may be excused.

2                    THE WITNESS: Thank you.

3                    THE COURT: Any further witnesses?

4                    MS. MENENDEZ: No, Your Honor.

5                    THE COURT: Any proffers or anything like that?

6          I'll leave time for argument, but...

7                    MS. MENENDEZ: No, Your Honor.

8                    THE COURT: All right.  Mr. Smith?

9                    MR. SMITH: Your Honor, we have one witness who is

10         Carissa Arutunoff.

11                   THE COURT: All right.

12                   MR. SMITH: Ms. Arutunoff?

13              DEFENSE WITNESS, CARISSA ARUTUNOFF, SWORN

14                   THE COURT: Go ahead and have a seat and state your

15         full name for the record and spell your last name for me.

16                   THE WITNESS: My name is Carissa Arutunoff,

17         A-R-U-T-U-N-O-F as in Frank, F as in Frank.

18                              DIRECT EXAMINATION

19         BY MR. SMITH:

20         Q    Good morning.  What's your relationship to Ms. Leslie

21         Hee?

22         A    She's my cousin.

23         Q    And how long have you known Ms. Leslie Hee?

24         A    My entire life.

25         Q    And where are you from?

1    A    I'm from Oklahoma.

2    Q    Okay.  And have you recently been personally involved

3    with Leslie Hee involving family matters?

4    A    Our grandmother passed away on February 17th of this

5    year, and that is the first time that I have seen Leslie in

6    quite some time --

7    Q    How much --

8    A    -- but we reconnected then.

9    Q    We have to take turns.  How much time?

10    A    I spoke to her on the phone in 2005.  I physically saw

11    her in 2002.

12    Q    Okay.  And when you and she began working on the

13    grandmother's estate issue, how often did you see her?

14    A    I saw her when my grandma passed away, she was there,

15    and then we came back and we cleaned out my grandmother's

16    house in March.

17    Q    And have you stayed in touch on the phone as well?

18    A    Yes.

19    Q    Okay.  Do you have Leslie Hee's passport with you?

20    A    I have it in my purse.

21    Q    Are you willing to surrender it if the Court so orders?

22    A    Yes.

23    Q    Would you do that today?

24    A    Yes.

25    Q    Do you have an opinion, based on your life-long

1      acquaintance with Ms. Hee, whether, if released, she would

2      abide by any orders and conditions set by the Court?

3      A     She would abide by all of them.

4      Q     And are you yourself willing to take some personal

5      responsibility for making sure that happens?

6      A     Yes, I am.

7      Q     And what would you do to make sure that happens?

8      A     I would stay here with her in Colorado to ensure that

9      she stays.

10     Q     And how long have you been here in Colorado thus far?

11     A     I've been here since May 5th.

12     Q     And why are you here?

13     A     Because she is my cousin and I love her and I'm not

14     going to leave her.

15     Q     And are you here to take care of her matters while --

16     A     Yes.

17     Q     -- she's in jail?

18     A     Yes.

19     Q     And what's -- based on your observation, what are

20     Leslie Hee's ties to this community?

21     A     Her children live here, her husband is here.  She's

22     lived here since -- wow, 1991 I believe.

23     Q     Okay.  In your opinion, would she be a threat to the

24     community or a danger if she's released?

25     A     I do not believe so.

1    Q    And would you take personal responsibility to make sure

2    that was true?

3    A    Yes, I will.

4    Q    Would you be willing to advise the Court if it ever

5    came to your attention that either she became a flight risk

6    or that she was engaging in activities that were dangerous

7    to the community?

8    A    Yes, I would.

9              MR.  SMITH:  Thank  you.    I  have  no  further

10   questions.

11             MS. MENENDEZ: May I inquire, Your Honor?

12             THE COURT: Yes.

13                       CROSS-EXAMINATION

14   BY MS. MENENDEZ:

15   Q    Good morning, ma'am.

16   A    Hi.

17   Q    You reconnected with Ms. Hee in February of 2011?

18   A    Yes, our grandmother passed away on February 17.

19   Q    And where -- you said that you got together in March

20   to clean out a house?

21   A    She passed away, and then we paid the rent at my

22   grandmother's house, she rented a duplex in Stillwater, and

23   we came back, me, my sister and Leslie came back to clean

24   out her house and pack everything up.

25   Q    And how long did she stay in Oklahoma?

1     A    At that time?

2     Q    Yes.

3     A    We were there from March the 17th until -- I think that

4     was a Thursday -- until Monday.

5     Q    And have you seen her -- Thursday, Friday, Saturday,

6     Sunday.  Have you seen her since the five days you spent

7     with her in March until May 5th?

8     A    I was here in -- I think March 25th I came here.

9     Q    For how long?

10    A    I want to say five or six days, I'm not sure.  I wasn't

11    here very long.

12    Q    Do you stay with Ms. Hee?

13    A    At her house?

14    Q    Uh-huh.

15    A    Yes.

16    Q    And in the pretrial services report it says that she

17    takes -- let me get this correct, excuse me.  It says that

18    she takes Topamax, Prednisone, Fentanyl, and Oxycodone for

19    something called Reflex Symptomatic Dystrophy Syndrome in

20    her foot.  Is that correct?

21    A    I know that she had foot surgery, I don't know the date

22    of the surgery, but, yes.

23    Q    And she takes those pills every day and those drug

24    substances every day?

25    A    Yes.  That I'm aware of.

1   Q   And said her husband is here.  Her husband is where?

2   A   He is in prison.

3   Q   Okay.  So he's not here?

4   A   Well, he's not here, he's in prison, but she goes and

5   sees him on a regular basis, puts money on his books.

6   Q   How long is he doing in prison?

7   A   I'm sorry?

8   Q   How long is he in prison for?

9   A   I believe he gets out -- I don't -- I'm not sure.

10   Q   What was the nature of the convictions?

11   A   I don't know.

12   Q   Would it surprise you to know that it was narcotics

13   distribution?

14   A   Yes.

15         MS. MENENDEZ: No further questions.

16         THE COURT: Redirect?

17                    REDIRECT EXAMINATION

18   BY MR. SMITH:

19   Q   Do you know whether Ms. Hee's husband is incarcerated

20   here in Colorado?

21   A   Yes, I do know he's incarcerated.

22   Q   And he's -- is he incarcerated in a state facility here

23   in Colorado?

24   A   I just know it's in Englewood.  I don't know the name

25   of it.

1    Q    And assuming he's incarcerated here in Colorado for a

2    drug conviction, does that change what you've said earlier

3    today?

4    A    No, it does not.

5              MR. SMITH: Thank you.  No further questions.

6              THE COURT: May this witness be excused?

7              MR. SMITH: Yes, Your Honor.

8              MS. MENENDEZ: Yes, Your Honor.

9              THE COURT: All right.  Thank you.

10             Any further witnesses?

11             MR. SMITH: No, Your Honor, we will simply rest on

12   that witness and the proffers contained in the brief filed

13   yesterday.

14             THE COURT: All right.  Let's see, the proffer, so

15   that the record's clear, I did read this.  Now, I'm sorry,

16   it was Carissa?  That's --I had Krista down for that.  All

17   right, Carissa, so she's testified today, so the only other

18   proffer is that a Ms. Erin Jackson Haight is a local family

19   friend and she attests to Ms. Hee's concern about her

20   children and she is of the opinion that Ms. Hee will appear

21   at all court appearances and will pose no threat to the

22   community.  Is Ms. Haight here to testify?

23             MR. SMITH: Your Honor, she is not.  I was in

24   personal contact with her and because of the intervening

25   holiday she said she would not be in town today.

1          THE COURT: Well, I'm not going to take any kind of

2     notice of that kind of proffer, because that's not tested.

3     I mean, I would want to know what her opinion was based on

4     and why, so that one I'm not going to take any note of.  Of

5     course, we have the other by direct testimony.

6          Anything further in the way of proffer?

7          MR. SMITH: Nothing further, other than we would

8     rely on the pretrial services report as well, which I don't

9     think we have to proffer, but I'll ask the Court to consider

10    it.

11         THE COURT: I'll take judicial notice of the

12    contents of the pretrial services report, including their

13    recommendation.

14         So I think we're ready then for argument unless

15    the government has redirect.

16         MS. MENENDEZ: I don't, Your Honor.  Thank you.

17         Your Honor, this Court is well aware of the

18    standards of 18 United States Code 3142(g) in determining

19    whether any form of conditional release will reasonably

20    assure the appearance of the defendant and the safety of the

21    community.   Those factors include the nature and

22    circumstances of the offense charged, including whether the

23    offense is a crime of violence or involves a narcotic drug,

24    the weight of the prosecution's evidence, defendant's

25    history and personal characteristics, including the

1    existence and nature of prior criminal record, the nature

2    and seriousness of the danger to the community posed by the

3    defendant's release.

4            Your Honor, this case is not like most of them

5    that come before a federal court, and I took a look at the

6    law for that reason, and I am citing to United States versus

7    Miller, 625 F.Supp 513, District of Kansas, 1985, and it is

8    citing to a First Circuit case, United States versus Jessup,

9    757 F.2d 378, First Circuit, 1985.  And it talks about the

10   fact that the presumption -- this line of cases, this

11   particular case says as follows, and then I'll argue from

12   there:  A defendant's contention that he is not this sort of

13   drug offender, i.e., one with important foreign connections,

14   that Congress had in mind when it created the presumption

15   does not preclude its application whether defendant fits

16   within its terms, and that argument goes to the weight

17   properly accorded the presumption.

18           In this case it was a small amount of cocaine, but

19   that idea has been put forth in lots of unpublished cases,

20   that the presumption applies for Oxycodone and it applies

21   for Fentanyl and it applies in those cases just like it does

22   in cocaine and methamphetamine.  And the presumption applies

23   here.   Ms. Hee has a number of charges that invoke  the

24   presumption, and if she's convicted of the serious bodily

25   injury or death resulting from the use of those drugs, she

1    is facing a 20-year minimum mandatory sentence.  The school

2    zone factor in the indictment increases the range of

3    sentencing that she could place, all of which -- that she

4    could face -- all of which make the risk of flight more

5    likely due to the severity of the potential sentences, but

6    that's really not what brings me here today, that's not what

7    makes us seek detention, because lots of people face long

8    sentences and they're walking around out on bond, and I have

9    personally agreed to bond in those circumstances.

10          What brings us here today is the risk of safety to

11    the community.   This is a different case than a

12    methamphetamine, cocaine case, because Ms. Hee holds the

13    instrumentalities of the crime legally in her possession.

14    She uses them, she used them to her advantage, and if she is

15    released on bond she is going to have legal prescriptions

16    to go out and get them because that's what she takes for her

17    conditions.   The harm that she has done in the community is

18    huge.  The Court has evidence about Ms. Wenter, about Ms.

19    Wilfley, about a Mr. Laurence, about a Mr. Torres (sic) that

20    were all part of this drug ring of addicted people that

21    Leslie Hee used in her business.

22          The risk of danger to the community could not be

23    more personified than a picture of an overdosed young woman

24    in a backyard frothing from the mouth and having her parents

25    wake up to get the newspaper and go drink a cup of coffee

1    and find her nearly unconscious in a yard and bringing her

2    into the house and having her sit there with drool coming

3    out of her mouth and having her say, "I told Leslie not

4    bring me here."  That is a blatant disregard for life.  It's

5    blatant.

6         And we know that Leslie Hee was involved in that

7    because of the statements that Ms. Wilfley made, and we're

8    in the interesting posture of being able to argue that the

9    state of incoherence adds credibility to the statements

10   because she wasn't -- she couldn't (inaudible), they were --

11   they were -- it's utterance coming out of her mouth, and

12   there was property returned to the house by the same -- by

13   a person driving the same vehicle that was connected to the

14   drug trafficking.

15        And in the conversation with Anna Wenter where Ms.

16   Wenter is so concerned about the death of Katina Phillips

17   and that she left behind a family and that she overdosed,

18   Ms. Hee hands over four tablets to Ms. Wenter and says,

19   "We'll settle up at the house."

20        Ms. Hee is a danger to the community at a level

21   that methamphetamine and cocaine distributors aren't.  From

22   the government's perspective, this is absolutely a clear-cut

23   case for detention, and we would note that the pretrial

24   services report says that the defendant is perceived a risk

25   of non-appearance and a danger to the community but they

1    find there are terms and conditions.  The government can
2    only hope today that the evidence that this Court has heard
3    has made the Court determine otherwise, and we ask the Court
4    to detain Ms. Hee.

5            THE COURT: Mr. Smith?

6            MR. SMITH: Thank you, Your Honor.

7            One of the strongest factors that the Court looks
8    at -- and I think in the Feaster case that I cited in my
9    brief cites several cases (inaudible) -- is does the person
10   have ties to the community, does the person -- does the
11   person have contacts with the community, and what is the
12   person's criminal history.  The cases say the weight of the
13   evidence in the case at bar is the least important factor,
14   and primarily that's because the presumption of innocence
15   remains which countervails that factor.

16           On the factors that are given the most weight, the
17   evidence points very strongly towards a very controlled and
18   conditioned release of Ms. Hee.  What the pretrial services
19   report has suggested is quite rationale and should carry
20   great weight given the institutional expertise in memory of
21   this organization.  I mean, basically what they're saying is
22   she's to continue in drug treatment, she is to have
23   monitored sobriety, she is to wear an ankle monitor, she is
24   to surrender any travel documents.  And we have added one
25   other thing, her cousin, who is a responsible individual and

1   who's known her all her life has volunteered to move to

2   Colorado basically and serve as a monitor of Ms. Hee, and

3   she has stated here under oath that if there is any

4   indication of danger to the community, if there is any

5   indication that Ms. Hee is not going to show up that she

6   personally will report to the Court.  You know, it's not

7   often that people feel so strongly about their support of a

8   defendant's release that they will actually come in court

9   and put themselves on the line in that kind of way.

10          I want to talk a bit about the prosecution's

11   evidence, and I simply -- I think it's important to consider

12   that on the issue of dangerousness, the proof, the burden of

13   proof is not a presumption but by clear and convincing

14   evidence, and I cited the authority for that in my brief in

15   State versus Feaster.  The District Court of Kansas case so

16   states as well.  And what they have offered against that

17   burden is hearsay within hearsay within hearsay, uttered by

18   individuals who, to a T, each have a personal interest in

19   this case.  They are defendants, or they are -- depending on

20   how liberally you view the testimony -- informants who have

21   something to gain, but they appear to be either defendants

22   and/or the parents of defendants.

23          Of course, at a bail hearing, a release hearing,

24   we don't follow technical Rules of Evidence, but I think it

25   would be a bit of a stretch to say that hearsay within

1    hearsay and testimony by persons who have a strong motive to

2    curry favor, to shift blame, could ever reach the level of

3    clear and convincing evidence, and for that reason it simply

4    does not prove dangerous -- dangerousness.  Moreover, while

5    always there in any criminal case one could say there's

6    always some risk of dangerous, there's always risk of not

7    appearing, pretrial services has set forth a very exacting

8    protocol that would strongly mitigate those concerns.

9         So for those -- that reason, Your Honor, I ask the

10    Court, you know, not to release Ms. Hee willy-nilly to her

11    own devices but to impose the bond, require the ten percent

12    that pretrial services has requested, to impose each and

13    every condition they impose.  The Court certainly can revoke

14    the bond if she violates any one of them.  I would also ask

15    the Court to appoint her cousin as a monitor and order her

16    to report to the Court if Ms. Hee, A, either appears -- does

17    not appear, or if she leaves the District, or if she appears

18    to be a danger.

19         I believe we have come forth with evidence that

20    there is a group of conditions that will reasonably assure

21    her appearance in court, reasonably assure that she will not

22    pose a danger to the community, and I ask the Court to so

23    order.  Thank you.

24         THE COURT: Any follow-up?

25         MS. MENENDEZ: No, Your Honor.

44

1          THE COURT: All right.

2          PROBATION OFFICER ZORN: If I may?  You had a

3   question, Your Honor, with the agent about Ms. Wilfley's

4   age.

5          THE COURT: Yes.

6          PROBATION  OFFICER  ZORN:  I  had  interviewed

7   (inaudible - not at microphone).   In 2009 she was

8   approximately 23 years old.

9          THE COURT: 23?  All right.  Thank you.

10         All right, looking at the factors, the first thing

11  the Court notes is that this is a case where the rebuttable

12  presumption favoring detention does apply.  It is a -- there

13  are  many  of  the  counts  that  are  compliant  with  that

14  presumption set forth in 18 U.S.C., Section 3142(e).  That

15  is a Congressional finding that people charged with this

16  kind of crime will be presumed that there's no condition or

17  combination of conditions that will assure the appearance of

18  the defendant, as required, and the safety of the community.

19  Now, that presumption obviously can be rebutted, and it

20  doesn't take a whole lot to rebut the presumption.  More

21  than a scintilla I believe the case laws says, but it's not

22  a huge factor.

23         However, I do disagree with defense counsel that

24  the Court looks to clear and convincing evidence for each

25  part of the Bail Reform Act, I think that's incorrect.  The

45

1    presumption -- or the burden of proof on the preponderance

2    of the evidence applies to whether or not the defendant is

3    a flight risk, and clear and convincing evidence applies to

4    whether or not the defendant poses a danger to the community

5    or anyone in it, including the defendant (inaudible).

6         MR. SMITH:  Actually, I agree, Your Honor, and

7    that's what I was trying to say.

8         THE COURT:  All right.  I think starting out I will

9    say that the presumption which actually deals with flight

10   risk has been rebutted in this case because primarily of the

11   defendant's long-term residence in the area, and I don't

12   think it takes very much more than that.  She has a cousin

13   who's living with her now, it's clear that her husband,

14   while in prison, is -- it sounds like he's at the FCI in

15   Englewood, and so she does have community ties.

16        Now, based on the government's presentation of

17   evidence here, those community ties may not be too good, but

18   she does have two children living here, that's noted in the

19   pretrial services report.  It looks like one of them may

20   live with her.  Her former husband was a co-defendant in

21   this case, but I noted that he had been dismissed from the

22   case.  So I'm going to find that the presumption was

23   rebutted to the extent that it goes to flight risk, but even

24   though the presumption is rebutted, the Court continues to

25   take that presumption into account as being one of the

1    factors, and that is the Congressional finding that people

2    who are charged with drug offenses do pose a danger to the

3    community and a flight risk.

4         Now, looking at the other parts of the Bail Reform

5    Act, the Bail Reform Act itself goes through -- and the

6    government quoted many of these -- the factors that the

7    Court has to look at, the nature and circumstances of the

8    offense charged, whether it involves a narcotic drug; the

9    weight of the evidence against the person; the history and

10   characteristics of the person, including their physical and

11   mental condition; family ties, et cetera; criminal history,

12   which Ms. Hee does not have a significant criminal history;

13   whether the person was on some kind of probation, parole, or

14   release pending trial, and the nature and seriousness of the

15   danger posed to any person or the community by the release.

16        We have here some of what I agree with defense

17   counsel is second- or third-hand information, but we have an

18   undercover police officer, not a confidential informant, who

19   is witness to the conversation between Anna and Ms. Hee.

20   Anna is a young person, described in her early to mid 20s,

21   and she is apparently talking about someone who overdosed on

22   prescription drugs and died, yet Ms. Hee continues to go

23   right forward and sells Anna more prescription drugs to sell

24   to others, or use herself, we don't really know that fact,

25   and, of course, also is talking to the undercover officer

1    about drugs, so I don't find that to be too far removed
2    because the information is coming from a police officer, and
3    I find that very compelling.

4              We also have information that directly comes from
5    a Mr. Laurence and a Ms. Torres, both of whom are co-
6    defendants in the case, and while motive is an issue, these
7    are consistent stories.  They're consistent with what the
8    undercover police officer is seeing, they're consistent with
9    what's happening before his eyes, and they're consistent
10   with each other.

11             And then we have testimony not from one of the co-
12   defendant's parents, but from a police officer who's
13   interviewed those parents about what happens to a 23 year
14   old young woman who is laying in her parents' backyard in
15   pretty bad shape, has to go to the emergency room.  We don't
16   have her testimony at this point, she is a co-defendant,
17   which says something in and of itself, and it doesn't say it
18   about motive, it says it about addiction and about people's
19   control over one another.

20             The evidence that I've heard is extremely strong,
21   largely, again, because it comes from a police officer, it
22   is not an informant who -- who's paid, although there may be
23   informants in the case as well.  And again, the evidence is
24   consistent, and so the weight of the evidence is quite
25   large, and the evidence in this case tells me that this

1    defendant is an extreme danger to the community, she is an

2    extreme danger to young people who are already addicted and

3    may have problems and could get themselves into trouble even

4    worse.

5          I am not discounting Ms. Arutunoff's testimony,

6    she seems like a nice person who really has the defendant's

7    best interests at heart, but she doesn't know her.   She

8    doesn't know her at all.   She hadn't seen her for nine years

9    before she saw her in February, she had talked to her once

10   on the telephone in all that time, and now she has formed a

11   bond with her, and that's all well and good, but that's not

12   enough to convince me that she could keep this defendant,

13   with what she's been doing with her life, out of endangering

14   the remainder of the community.

15         I agree with the government that this case is

16   absolutely very clear and convincing.   The presumption I'm

17   taking into account as one of the factors and using all of

18   the other factors, and I'm going to find that there's no

19   condition or combination of conditions which the Court could

20   impose in connection with pretrial release that would

21   reasonably assure both the appearance of the defendant as

22   required, but, more importantly, the safety of any other

23   person or the community.

24         One of the reasons that I am keeping the

25   appearance of the defendant in the mix in spite of the

49

1     rather minor evidence about community contacts here is that

2     she was contacted and arrested apparently by West Metro Task

3     Force and within less than a week, just a few days later

4     she's out selling to another undercover police officer in

5     this case.   She clearly has no regard for the judicial

6     system or what her responsibilities might be, and so I find

7     her, by a preponderance of the evidence, to be a flight risk

8     as well, and I'll order that she be detained without bond

9     pending all further proceedings in the case.

10          Anything further?

11          MS. MENENDEZ: Nothing from the government.

12          MR. SMITH: Nothing for defense.

13          THE COURT: All right.  We'll be in recess on that

14     matter.   I believe that concludes our morning docket, so

15     court will be in recess.

16          THE CLERK: All rise.

17          (Whereupon, the within hearing was then in

18     conclusion at 11:32 a.m. on May 31, 2011.)

19

20          I certify that the foregoing is a correct

21     transcript, to the best of my knowledge and belief, from the

22     record of proceedings in the above-entitled matter.

23

24     /s/ Bonnie Nikolas                July 05, 2011

25     Signature of Transcriber                Date


AVERY/WOODS REPORTING SERVICE, INC.
455 SHERMAN STREET, SUITE 250, DENVER, CO  80203
303-825-6119     FAX 303-893-8305

1                    ** WITNESS INDEX **

2     GOVERNMENT WITNESS                        PAGE

3     SPECIAL AGENT TYLER BROWN

4     Direct Examination by Ms. Menendez          6

5     Cross-Examination by Mr. Smith             22

6     Redirect Examination by Ms. Menendez       27

7     Recross-Examination by Mr. Smith           28

8

9     DEFENSE WITNESS

10    CARISSA ARUTUNOFF

11    Direct Examination by Mr. Smith            30

12    Cross-Examination by Ms. Menendez          33

13    Redirect Examination by Mr. Smith          35

14

15

16

17

18

19

20

21

22

23

24

25

AVERY/WOODS REPORTING SERVICE, INC.
455 SHERMAN STREET, SUITE 250, DENVER, CO  80203
303-825-6119     FAX 303-893-8305