IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Action No. 11-cr-00188-JLK

UNITED STATES OF AMERICA,

    Plaintiff,

vs.

LESLIE RENEE HEE,

    Defendant.

_____

REPORTER'S TRANSCRIPT
HEARING ON DEFENDANT'S MOTION TO REVOKE MAGISTRATE'S DETENTION
ORDER

_____

    Proceedings before the HONORABLE JOHN L. KANE, JR.,
Senior Judge, United States District Court for the District of
Colorado, commencing at 2:07 p.m., on the 31st day of August,
2011, in Courtroom A802, Alfred A. Arraj United States
Courthouse, Denver, Colorado.

**APPEARANCES**

    M. J. MENENDEZ, Assistant United States Attorney,
1225 17th Street, Suite 700, Denver, CO  80202, for plaintiff.

    MARTHA ESKESEN, Martha H. Eskesen, P.C., 6200 South
Syracuse Way, Suite 125, Greenwood Village, CO  80111, for
defendant.

Proceeding Reported by Mechanical Stenography, Transcription
Produced via Computer by Kara Spitler, RMR, CRR,
901 19th Street, Denver, CO, 80294, (303) 623-3080

```
 1                     P R O C E E D I N G S

 2        (In open court at 2:07 p.m.)

 3             THE COURT:  Thank you.  Good afternoon, and be seated,

 4   everyone.

 5             This is 11-cr-188, United States of America vs. Leslie

 6   Renee Hee.  The matter comes on for consideration of the

 7   defendant's motion to revoke the detention order pursuant to

 8   U.S. Code section 3185, docket no. 140 in this court.

 9   Government has filed its response in document no. 151.  I have

10   read the motion, the response, and the transcript and exhibits

11   that were attached to the Government's response.  I've also

12   read the addendum and correction to the Government's response,

13   which is document 154, and the original motion, of course.

14             So I am ready to proceed.

15             Is the Government ready to proceed?

16             MS. MENENDEZ:  We are, Your Honor.

17             THE COURT:  Thank you.

18             Defense ready?

19             MS. ESKESEN:  Yes, we are, Your Honor.

20             THE COURT:  All right.

21             Let's -- the Government needs to present evidence.

22             You have evidence; is that correct?

23             MS. MENENDEZ:  We do, Your Honor.  This -- my name is

24   M. J. Menendez.  I'm here for the United States.  With me at

25   counsel table today, with the Court's permission, is Charlotte
```

1    Musser, who is a paralegal in our office.

2              THE COURT:  Sure.

3              MS. MENENDEZ:  This is Special Agent Tyler Brown from

4    the Drug Enforcement Administration, and he would be our

5    witness today, if the Court chooses to have an evidentiary

6    hearing.

7              THE COURT:  Well, I think we should have some

8    evidence, and I do think that since the motion has been filed,

9    it's probably best to let you proceed first.

10             MS. MENENDEZ:  Yes, sir.

11             THE COURT:  And then we'll go to the defense, if you

12   have any testimony this afternoon.

13             MS. ESKESEN:  Your Honor, it depends on what

14   transpires during the Government's presentation.

15             THE COURT:  Okay.

16             Can I see counsel at sidebar for just a minute,

17   please.

18       (Proceedings were had outside the court reporter's

19   hearing.)

20             MS. MENENDEZ:  May it please the Court and counsel,

21   the Government will call Special Agent Tyler Brown to the

22   stand.

23             THE COURTROOM DEPUTY:  If you would step right over

24   here, please.

25             Your attention, please.

1          (**TYLER BROWN, GOVERNMENT'S WITNESS, SWORN**)

2          THE COURTROOM DEPUTY:  Thank you.

3          Please be seated.

4          Please state your full name for the record, spelling

5   your first and last names.

6          THE WITNESS:  My name is Special Agent Tyler Brown.

7   T-Y-L-E-R.  B-R-O-W-N.

8          MS. MENENDEZ:  May I inquire, Your Honor?

9          THE COURT:  Please.

10          MS. MENENDEZ:  Thank you.

11                        **DIRECT EXAMINATION**

12   BY MS. MENENDEZ:

13   Q   Sir, what do you do for a living?

14   A   I'm a special agent with the Drug Enforcement

15   Administration.

16   Q   How long have you worked in that capacity?

17   A   I've been a special agent with DEA for approximately two

18   years.  Prior to that, I was with DEA in the capacity of a

19   diversion investigator for four years.

20   Q   What is a diversion investigator?

21   A   Diversion investigator investigates the movement of licit

22   controlled substances, pharmaceutical controlled substances, to

23   illicit markets.

24   Q   And did I hear correctly that you said "licit controlled

25   substances," L-I-C-I-T?

Tyler Brown - Direct

1   A    Correct, legal controlled substance, pharmaceutical

2   controlled substance, schedule II through V.

3   Q    And this case actually involves licit pharmaceuticals?

4   A    Correct.

5   Q    And you said you're working in a different capacity?

6   A    Correct.  In 2009 I went back to Quantico, Virginia, and

7   trained to become a special agent and converted that capacity

8   in 2009.

9   Q    Are you still working cases that have to do with

10  pharmaceuticals?

11  A    Correct.  I was assigned to the Denver field division,

12  specifically the tactical divergence squad, where our focus is

13  investigations involving pharmaceutical controlled substance

14  that are diverted to illicit markets.

15  Q    Are you familiar with the investigation that brings us here

16  today?

17  A    I am.

18  Q    Do you recognize the name "Leslie Hee"?

19  A    I do.

20  Q    Would you recognize that person if you saw her again?

21  A    Yes.

22  Q    In November of 2010, did you have personal dealings with

23  Miss Hee?

24  A    Yes, I did.

25  Q    And would -- is she in the courtroom here today?

Tyler Brown – Direct

1   A   Yes, she is.  She's at defense table.

2   Q   And what color is she wearing?

3   A   Yellow.

4   Q   Okay.

5           Now, Special Agent Brown, was that the extent of your

6   job in this case, is one transaction with Hee, or was it bigger

7   than that?

8   A   No, ma'am.  I became the case agent roughly in mid to late

9   2010, and I also assisted with the case in 2009.

10  Q   Who had the case before you with the DEA?

11  A   Divergence Investigator Bryon Bruce.

12  Q   And speaking candidly to the Court, which of course I ask

13  you to do, but I really ask you to do here because I think it

14  involves an issue with the U.S. attorney's office, why was

15  there a delay between -- that caused you to take the case from

16  Special Agent Bryon Bruce?

17  A   Well, he, he transferred out of the Denver division to a

18  different capacity within DEA.

19  Q   And it took a while for me to indict it, fair?

20  A   Fair enough.

21  Q   Fair.

22          Bryon, Bryon, is that B-R-Y-O-N?  And the next word is

23  B-R-U-C-E?

24  A   Yes, ma'am.

25  Q   Okay.

Tyler Brown – Direct

1          As case agent in this case, what do your

2   responsibilities include?

3   A    Case agents directs the case, makes operational decisions,

4   plans and coordinates all operation, and plans where the case

5   is going to go and investigates it.

6   Q    Sir, have you looked at the Government's response today to

7   Miss Hee's motion for order of revocation of detention?

8   A    Yes, I have.

9   Q    And the facts that are contained therein, where did those

10  facts come from?

11  A    They came primally from DEA and Denver Police Department

12  and West Metro Task Force police reports.

13  Q    And they were turned over to us in discovery, correct?

14  A    Correct.

15  Q    Now, there is one incident in the Government's response

16  that I want to start with that came later in the investigation.

17  In fact, I'm directing you to May 31, 2011.  What happened on

18  that day?

19  A    I'm sorry, ma'am, May 31, 2011?

20  Q    2011?

21          Did I see you in court on that day?

22  A    Oh, I'm sorry.  Yes, ma'am.

23  Q    Okay.

24  A    Yes.  We appeared for the detention hearing.

25  Q    Detention hearing of who?

Tyler Brown – Direct

8

1    A    Leslie Hee.

2    Q    Okay.

3         And was that the first time that you had appeared in

4    court for that detention hearing?

5    A    No.  It had been delayed, I believe, twice.

6    Q    Okay.

7         And on one of those dates, which I believe to be

8    May 17, 2011, did you have a conversation with the parents of

9    one of the codefendants?

10   A    Yes, ma'am, I did.

11   Q    Who is that codefendant?

12   A    Codefendant is Eleanor, known to us as Ali, Wilfley.

13   Q    What is the name of her parents?

14   A    Max and Jolene.

15   Q    And that's Jolene, J-O-L-E-N-E?

16   A    Yes.

17   Q    Max, M-A-X?

18   A    Yes.

19   Q    And Ali is A-L-I, correct?

20   A    Correct.

21   Q    All right.

22        And who else was present at that interview besides you

23   and I and Jolene and Max?

24   A    Defense counsel for Miss Wilfley.

25   Q    What's her name?

Tyler Brown – Direct

1    A    Don't recall it offhand.

2    Q    Okay.

3             If I said it to you, would you recall it?

4    A    Yes, ma'am.

5    Q    Paula Ray?

6    A    That's correct.

7    Q    Okay.

8             And can you tell us how that conversation with the

9    Wilfleys came to be?

10   A    Yes.  Essentially Miss Wilfley apparently had been -- had

11   an incident in which the parents were involved in related to

12   the investigation with Leslie Hee, and you had discussions with

13   defense counsel regarding that, which is why the interview was

14   subsequently conducted in the courthouse.

15   Q    And the events that we heard about that day related to

16   Eleanor Wilfley and an incident with an overdose, fair?

17   A    Correct.

18   Q    Did you have personal conversations with parents Jolene and

19   Max?

20   A    Yes.

21   Q    Okay.

22             Can you please tell the Court what those folks had to

23   say about that incident and give us an approximate time of the

24   incident?

25   A    The incident occurred roughly in the spring of 2008.  I'm

1   sorry, spring of 2009.  Correction.

2         And the parents woke up like every other morning.

3   They noticed in their back yard, when they were just making

4   breakfast, that their daughter, Ali Wilfley, was laying there.

5   Q   Laying where?

6   A   Laying in the back yard of their house.

7   Q   Okay.

8   A   To the parents' knowledge, Miss Wilfley was living with

9   Leslie Hee at the time.  So they immediately ran out there and

10  tried to figure out what was going on.  And Ali was laying

11  there, essentially unconscious, unresponsive, drool coming down

12  her chin and the parents stated that they immediately assumed

13  it had something to do with a drug overdose because they had

14  knowledge that Ali was involved in drug activities with Leslie

15  Hee.

16  Q   And Ali is an addict, correct?

17  A   Correct.

18  Q   And Katina Phillips was an addict?

19  A   Correct.

20  Q   And Jeremiha Bennett, who is deceased, he used drugs,

21  right?

22  A   Correct.

23  Q   So when the parents went out and they found their daughter,

24  was she standing, sitting, what position was she in?

25  A   Initially in the back yard, she was, she was lying down.

1  But they, they pulled her up, sit her up, and tried to wake her

2  up, so to speak, and make her respond, just to see if she was

3  alive and breathing and everything, and didn't have much

4  response, but she was alive.

5         And so they took her inside the house and sat her in a

6  chair and again she was just kind of sitting there,

7  unresponsive, with the drool and so they subsequently took her

8  to the emergency room.

9  Q   Do you remember what Miss Wilfley told us about -- said to

10  us with regard to the position in the house of their daughter?

11  A   I do not.

12  Q   What -- do you remember anything about her head?

13  A   The head was slumped over, kind of leaned over like this.

14  Q   And what, what was she saying, daughter?

15  A   Ali was mumbling that she had told Leslie Hee that -- not

16  to take her to her parents' house.

17  Q   And as I recall the conversation, was it "Leslie Hee" or

18  was it I told "Leslie"?

19  A   Leslie.

20  Q   Okay.

21         And did she say it one time or did she keep repeating

22  that?

23  A   She kept repeating it.  And even after the hospital, after

24  they -- she got out of hospital and moved back in with her

25  parents, she had made those --

Tyler Brown – Direct

1  Q   Let me go there.

2  A   Yes, ma'am.

3  Q   You said she went to Swedish for the night; is that

4  correct?

5  A   Correct.

6  Q   And she stayed overnight?

7  A   As far as what the parents stated, yes.

8  Q   And after she got out of the hospital, where did she go to?

9  A   She came back to the parents' house.

10 Q   At that time, based on what you were told by the parents,

11 did Eleanor, Ali, Wilfley give the parents a statement about

12 what had happened?

13 A   Yes.

14 Q   And what was that statement?

15 A   She had told her parents that she, she was telling Leslie

16 not to take her back to the house, to her parents' house.

17 Q   Let's go now to what is referred to in the Government's

18 report or response, excuse me, as factors 1, 2, 3, 4, 5.

19 A   Yes, ma'am.

20 Q   Now, Special Agent Brown, we didn't talk about a lot of

21 this at the detention hearing.  Fair?

22 A   Correct.

23 Q   Why?

24 A   You had made a decision as to what to present as evidence,

25 and that was your decision to make and present to the court.

Tyler Brown - Direct

13

1  Q   And in fact, I advised us that we should stay away from all

2  of this --

3          MS. ESKESEN:   Your Honor, I'm going to object to the

4  prosecutor testifying here because the questions are basically

5  the prosecutor testifying.

6          THE COURT:   The question is leading.   The objection is

7  sustained on that basis.

8  BY MS. MENENDEZ:

9  Q   Do you recall what this -- why those questions were not

10  asked; do you recall what we discussed?

11  A   I do not recall, no.

12  Q   Okay.

13          But it's fair to say, some of this we're about to

14  discuss was not presented at detention; is that correct?

15  A   Correct.

16  Q   But it was given over in initial discovery, correct?

17  A   Correct.

18  Q   Okay.

19          Let's talk about . . . let me stop and rephrase.

20          MS. MENENDEZ:   Your Honor, Exhibit 1 to Government's

21  response is the transcript from the detention hearing, and if

22  we can ask the Court at this time to take judicial notice of

23  Exhibit 1.

24          THE COURT:   I have it.   I've read it, and I do take

25  judicial notice of it.

1     MS. MENENDEZ:  Thank you, Your Honor.

2  BY MS. MENENDEZ:

3  Q   Let's go to the Government's response, factor 2, please.

4          And I want you to tell me, if you can, about the

5  prescription history associated with the Leslie Hee, what we

6  call the Leslie Hee drug ring, okay?

7  A   Yes, ma'am.

8  Q   Before we do that, advise the Court, please, how you came

9  to know the constituency of the Leslie Hee drug ring?

10  A   Well, again, the investigation was begun in 2008 by

11  diversion Investigator Bryon Bruce.  He developed leads over

12  time and specifically we started identifying several

13  individuals through surveillance and as well as prescription

14  drug monitoring records.

15         By putting the two together as well as with undercover

16  buy records, the three together, I should say, that's how we

17  came about to develop who was involved in the Hee

18  drug-trafficking organization.

19  Q   And you have written notes; is that correct, sir?

20  A   Correct.

21  Q   And what is the reason for your notes around these

22  prescription -- this prescription testimony that I'm about to

23  ask you?

24  A   I wrote the notes because there -- it's -- there's

25  extensive amount of information related to the prescription

Tyler Brown - Direct

1   drug histories of these individuals, very specific to

2   quantities and dosages; and so I wrote some notes to generalize

3   what each individual was obtaining during the conspiracy days.

4   Q   Okay.

5       Can you tell us about Leslie Hee's prescription

6   activity from -- well, you tell us what dates.

7   A   Well, for the better chunk of 2008, roughly spring 2008,

8   through to October 2008, Leslie Hee had obtained and filled

9   fentanyl and various oxycodone prescriptions in five, 600

10  range.  I can't give an exact quote without looking at the

11  Government's response, but it was a large quantity of fentanyl

12  patches and oxycodone products with majority of the

13  prescriptions being written by Dr. Nicole Hoffman.

14  Q   When you reviewed Government's response, did you match it

15  to your records?

16  A   Yes, I did.

17  Q   And do you believe that the information in the Government's

18  response is correct?

19  A   Yeah, to the best of my knowledge, yes.

20  Q   And you didn't bring handwritten notes with you today?

21  A   I brought notes, and they are -- they were general as far

22  as the amounts and so forth.

23  Q   Okay.

24      So if Government's response from your information

25  indicates that between April 7, 2008, and October 22, 2008,

Tyler Brown – Direct

1   Miss Hee received prescriptions for 651 fentanyl patches, does

2   that sound correct?

3   A   Yes, ma'am.

4   Q   Okay.

5        Does it also sound correct that she received

6   830 Oxycontin tablets in that same period of time?

7   A   Yes, ma'am.

8   Q   All right.

9        And both of those are addictive, schedule I controlled

10  substances, correct?

11  A   Yes.

12  Q   Okay.

13       Ali Wilfley, what is her relationship to Leslie Hee in

14  terms of this investigation?

15  A   Investigation indicated that she was somewhat of

16  lieutenant, so to speak, because she showed up for undercover

17  deals when Leslie Hee was unable to make it.  With task force

18  Officer Tony Huskey, as well as her also obtaining similar

19  prescriptions from Dr. Hoffman and surveillance as well.

20  Q   Can you give the Court an estimate, a ballpark, of the

21  numbers of drugs that Ali Wilfley was getting?

22  A   It was, it was similar to Leslie Hee's, and it was

23  oxycodone and fentanyl products as well.

24  Q   In fairness to the record, Government's response said she

25  only got a total of 250 fentanyl patches; does that sound

1  right?

2  A    Yes, that's correct.  I overstated.

3  Q    Okay.

4        And she received a large number of Oxycontin,

5  oxycodone, correct?

6  A    Correct.

7  Q    Anna Wenter, how does she fit into the puzzle?

8  A    Anna Wenter, again, had prescription activity specific to

9  Dr. Hoffman as well, with the narcotic substances.  And she

10  also had some participation in undercover deals with our

11  undercover operations.

12  Q    Let's talk about that for a moment, if we can, because that

13  is one of the pieces of response that the Government's cleared

14  up.  So you said that Anna Wenter was at undercover deals.  Was

15  one of those October 20 of 2008?

16  A    Yes, it was.

17  Q    Okay.

18        Can you tell Court about that deal, please, which is

19  also referenced in our response?

20  A    Yes.  I reviewed task force Officer Tony Huskey's report;

21  and based on that report and Government's response, basically

22  task force Officer Huskey was in the vehicle with Leslie Hee

23  when the undercover operation began.  And as they're discussing

24  doing a future deal for controlled substances, Anna Wenter

25  entered the vehicle.

Tyler Brown – Direct

1        Anna Wenter and Leslie Hee began discussing the fact

2   that Katina Phillips had overdosed and died and that they were

3   sad about it and so forth and continued on with the

4   conversation.

5        Leslie Hee and Anna Wenter diverted, started talking

6   about some other things, and Tony Huskey was basically just

7   sitting there observing the conversation.  Anna Wenter was

8   there to apparently purchase controlled substances,

9   specifically Oxycontin, from Leslie.  Leslie subsequently

10  handed over four Oxycontin, they were yellow, what the task

11  force officer identified as 40-milligram Oxycontin, tablets.

12  Leslie and Anna had a discussion about price, and Leslie stated

13  that she was going to settle up back at the house and Anna

14  could come over and they could settle up back at the house.

15  Q   Now, this discussion about the death of Katina Phillips on

16  October 20, 2008, how long was that after Miss Phillips had

17  died?

18  A   Approximately four, five days.

19  Q   Okay.

20       And is -- based on the response that I initially

21  filed, you called me and said, hey, let's pull the tape and

22  let's look at this --

23       MS. ESKESEN:  Your Honor, I'm going to object to this

24  again as leading.

25       MS. MENENDEZ:  This is foundation, Your Honor.

Tyler Brown - Direct

1       THE COURT:  Overruled.

2       MS. MENENDEZ:  Thank you.

3   BY MS. MENENDEZ:

4   Q   Did you -- did we pull the tape and review it again?

5   A   Yes, I pulled the recording and reviewed it again.

6   Q   And was the conversation -- how would you describe the

7   conversation in terms of duration?

8   A   The full recording was about an hour, but that's inclusive

9   to Tony preparing it, so forth.  But the conversation between

10  Anna and Leslie was far more extensive than what was initially

11  stated in Government's response.

12  Q   And was the tone of the conversation morose or what; what

13  can you hear in the conversation?

14  A   Could you get a little more detailed as far as what you're

15  asking.

16  Q   Sure.  Were people crying, were they laughing, were they

17  doing neither?

18  A   No.  No.  They were laid back.  It wasn't an uptight

19  situation.  Anna, Anna was extremely upset.  Leslie was a

20  little more laid back, but Anna also swayed back and forth as

21  far as what her feelings seemed to be.  I wasn't there, so I

22  can't specifically, you know, state how they were feeling or

23  anything; but that was -- that's from listening to the

24  recording, that's the feeling I got.

25  Q   Did you hear anything in that recording that led you to

Tyler Brown – Direct

1 believe that Miss Hee knew Miss Phillips?

2 A   Absolutely.

3 Q   Okay.

4       Like what?

5 A   Well, immediately they started discussing who Katina was

6 and how beautiful she was and had two babies and two children

7 and so forth.

8 Q   Okay.

9       MS. MENENDEZ:  We're doing a deviation, Your Honor,

10 but I'm going to go Government's Exhibit 5 now.  And -- excuse

11 me, factor 5.

12 BY MS. MENENDEZ:

13 Q   Who is Andrea Green?

14 A   Andrea Green is Katina Phillips' sister.

15 Q   Okay.

16       And after the death of Katina Phillips on around

17 October 16, 2008, did law enforcement have a conversation with

18 Andrea Green?

19 A   Yes.  Diversion Investigator Bruce and group supervisor

20 Mike Webster telephonically contacted Miss Green.

21 Q   And did Miss Green have any information about Miss Phillips

22 and her activities preceding her death?

23 A   Yes, she basically stated that she knew about Leslie Hee.

24 Katina had told her that -- excuse me -- Katina had told her

25 that Leslie had met Katina at a drug-addiction meeting and

Tyler Brown - Direct

1    Katina had -- Leslie was buying nice things for Katina.  She

2    also mentioned Anna Wenter and Ali Wilfley and how she was

3    giving nice things.  But stated that Ali Wilfley was the

4    closest to Leslie because she had heard that she lived with her

5    and also drove her Infiniti SUV.

6    Q   And what was the historic relationship, if any, between

7    Anna Wenter and Katina Phillips and Andrea Green?

8    A   They had gone to school together.

9    Q   Okay.

10        And did Andrea Green have anything else to say about

11   the death of Katina Phillips?

12   A   Yes.  She also related that she felt that Dr. Hoffman had

13   something to do with it, as she was writing prescriptions for

14   all of these people involved with Leslie Hee for narcotics.

15   Q   Going back to the incident in the vehicle with Tony Huskey

16   and Anna Wenter and Leslie Hee, did Anna Wenter say anything

17   about the estranged husband of Katina Phillips?

18   A   Yes.  She, based on the reports written by TFO Huskey, she

19   had stated in the vehicle that she was afraid that the husband

20   of Katina was going to report to law enforcement Leslie Hee's

21   drug ring.

22   Q   Okay.

23        Let's come back, sir, to the prescription records that

24   we were talking about.  We've discussed Anna.  Anna Wenter.

25        Do you know who Eric Grengs is?

Tyler Brown - Direct

1   A   Yes, I know him as Anna Wenter's boyfriend at the time.

2   Q   And you've reviewed Government's response with respect to

3   Mr. Grengs?

4   A   Yes.

5   Q   And you compared it to your information?

6   A   Correct.  Yes.

7   Q   Do you believe that the information that between

8   January 23, 2008, and October 17, 2008, Mr. Grengs received 945

9   oxycodone is correct?

10  A   Yes.

11  Q   And who -- scratch and moving on.

12          Katina Phillips, you have her autopsy reports,

13  correct?

14  A   Yes.

15  Q   Okay.

16          What did she die of?

17  A   She drowned with contributing factors of narcotic overdoses

18  of various substances.

19  Q   And what was in her system, do you recall?

20  A   To the best of my recollection, it was cocaine, Ecstasy,

21  and oxycodone.

22  Q   And the oxycodone in her system, so the Court is aware,

23  have you ever been able to say or have you ever said that that

24  oxycodone was handed to her by Leslie Hee?

25  A   No, ma'am.

Tyler Brown – Direct

23

1  Q   Okay.

2        Who wrote the majority of the prescriptions to Katina

3  Phillips?

4  A   Dr. Hoffman.

5  Q   Okay.

6        And we will talk about the ledger in a moment.

7        Let's go to Benjamin Draughon, D-R-A-U-G-H-O-N.

8        Who is he?

9  A   Benjamin was present the night of Katina's death, and with

10 the first responders, he was there when they first responded to

11 the emergency call.

12 Q   And is he also a patient of Dr. Hoffman's?

13 A   Yes.  Yes.  He was receiving narcotic prescriptions from

14 Dr. Hoffman.

15 Q   And you did the same drill of matching your description --

16 your information to the Government's response?

17 A   Yes, ma'am.

18 Q   Does it sound correct that from August 25, 2008, to

19 November 3, 2008, Mr. Draughon received prescriptions of a

20 total of 480 Oxycontin?

21 A   Yes, ma'am.

22 Q   Okay.

23        I'm going to skip down to Casey and Alysia Massey.

24        Let me --

25        MS. MENENDEZ:  If I may have just a moment, Your

 1  Honor?

 2          THE COURT:  Yes.

 3  BY MS. MENENDEZ:

 4  Q   I don't want to go there, sir.  I may return.

 5          Who I really want to go to is Jeremiha Bennett, okay?

 6  A   Yes, ma'am.

 7  Q   Tell the Court the story of Jeremiha Bennett.

 8  A   Jeremiha Bennett died of an overdose as well, roughly

 9  April 25, I believe, 2008.  The significance of his death is

10  that he was found dead in Leslie Hee's resident.

11  Q   And in fact, who was the reporting party to law enforcement

12  on that day?

13  A   Leslie Hee was.

14  Q   And you -- I believe we've attached the autopsy reports

15  from Jeremiha Bennett to our Government's response.  Have you

16  seen those, sir?

17  A   Yes, I have.

18  Q   And he had about nine drugs in his system, correct?

19  A   Correct.

20  Q   Okay.

21          Was there anything particular about the fentanyl that

22  he had in his system?

23  A   I believe the primary, based on coroner's report, the

24  primary cause of death was the fentanyl and Ecstasy.

25  Q   Okay.

Tyler Brown – Direct

1          Who wrote his prescriptions?

2    A    I can't recall if it was Hoffman or Benoist.

3    Q    All right.

4          Lastly, sir, we're going to go to factor 6, which is

5    attached to the Government's response as Exhibit 6.  And we

6    know it as the ledger.

7    A    Correct.

8    Q    Tell me when -- tell me when we got that document.

9    A    West Metro Drug Task Force conducted two controlled

10   purchases from Leslie Hee and Ali Wilfley roughly July of 2008.

11   Q    And you had pointed out to me that that is another mistake

12   in the Government's response, correct, sir, on page 12?

13   A    Yes, sir.

14   Q    So the actual date of that West Metro buy was July of 2008?

15   A    Yes, I believe so.

16   Q    Was there one or were there more?

17   A    I believe there were.

18   Q    Can you tell the Court briefly what happened in those buys?

19   A    Well, after the second operation, West Metro Drug Task

20   Force decided to arrest Leslie Hee and Ali Wilfley.  Leslie Hee

21   gave some statements that she had been dealing drugs but she

22   minimized as far as what her, what her roles were.  And

23   additionally a ledger was discovered by West Metro during the

24   arrest.

25   Q    Now, you have looked at the Government's Exhibit 6, sir?

Tyler Brown - Direct

1   A    Yes.

2   Q    Those are copies of the pages from the ledger?

3   A    Yes.

4   Q    Okay.

5          Can you tell us what -- whether anything was included

6   about the ledger referring to any of the codefendants?

7   A    Yes.  There were notations for both Katina and Anna in

8   there.  Specific to Anna, there was, there was a separate

9   section of what appeared to be financial debts owed by Anna to

10  Leslie, and Katina had a number next to her, her name as well.

11  Q    Okay.

12         And do you recall -- does it sound correct to you that

13  the number next to Katina was 200?

14  A    Yes, that sounds correct.

15  Q    Okay.

16         And the rest of the information that we've included

17  for the Court with regard to the ledger includes things like

18  red, yellow, blue.  What significance is that to you as a

19  diversion investigator?

20  A    Well, after reviewing the notes there in the ledger, that

21  automatically would have flagged me as being the colors of the

22  pills.

23  Q    Okay.

24  A    And various colors represent different milligram dosages.

25  Q    And so, just for instance -- well, let me go back and ask

Tyler Brown - Direct

1    it this way.

2           Did you do an analysis of the ledger, the entries in

3    the ledger, with respect to the pills and the colored pills as

4    to whether that had a correlation to street value that made

5    sense in your experience?

6    A    Yes.

7    Q    Would you tell the Court about that.

8    A    Yes.  The -- basically on the street, Oxycontin can go

9    anywhere from 50 cents to a dollar on the milligram, which is

10   also comparable to the prices we were paying during our

11   undercover operations into Leslie Hee.

12          The prices next to the various red and the numbers

13   next to that lined up with that range, which would tell me that

14   that's what she was charging for her pills.

15   Q    Special Agent Brown, the information that you gleaned in

16   your investigation and you learned from the, from the

17   surveillance, did that tell you anything about where Leslie Hee

18   conducted her business?

19   A    I'm sorry.  Can you be more specific?

20   Q    Did she conduct any of this business from her homes?

21   A    Yes.  She -- when we did surveillance, I believe it was

22   1401 Clayton, she had a lot of traffic there.  And as well as

23   having several individuals living there and stopping in, such

24   as Ali Wilfley and other codefendants in this case.

25   Q    And codefendant Joslyn Torres, who is she?

Tyler Brown - Direct

1   A    She's another individual that was involved in the Hee

2   organization and charged in this case.

3   Q    How old is she?

4   A    Early 20s.

5   Q    Is she addicted?

6   A    Appears to be, yes.

7             MS. MENENDEZ:  If I may have just a moment.

8             THE COURT:  You said 1401 Clayton.  Was that South

9   Clayton?

10            THE WITNESS:  Yes, sir, South Clayton.

11            THE COURT:  All right.  Thank you.

12  BY MS. MENENDEZ:

13  Q    Let me just close up a loop and sit down.

14            I mentioned Casey Massey and his wife.  Can you tell

15  us whether those names, those people, had any relationship to

16  Leslie Hee?

17  A    Yes.  Casey Massey did, did come up in the investigation,

18  died as an overdose as well.  And Alysia Massey -- well, let me

19  back up a little bit.

20            Their vehicle registered to them had been observed on

21  surveillance during the surveillance operations and so we had

22  identified them as being involved with Leslie Hee.

23  Q    And they showed up in surveillance in this case?

24  A    Correct, yes.

25  Q    And Casey Massey is dead of an overdose?

Tyler Brown – Direct

1    A    Yes.

2              MS. MENENDEZ:  No further questions.

3              MS. ESKESEN:  One moment, Your Honor.

4                          **CROSS-EXAMINATION**

5    BY MS. ESKESEN:

6    Q    Good afternoon.

7    A    Good afternoon.

8    Q    Agent, you and I have not met before?

9    A    No.

10   Q    Correct?

11             Now, you were answering some questions and referring

12   to some analyses that you had performed in connection with this

13   case in your investigation?

14   A    Yes.

15   Q    Analyses of, of drug purchases, prescription filling,

16   things like that; is that correct?

17   A    Yes.

18   Q    And also with respect to your review of Government's No. 6,

19   the -- what you refer to as a ledger, correct?

20   A    Yes.

21   Q    And do you have those notes here with you today as far as

22   the analysis that you performed?

23   A    I do.

24   Q    Okay.

25             Will you be willing to share those?

Tyler Brown - Cross

1    A    Yes.

2    Q    Okay.

3         And those are not something that is -- that you have

4    provided that are produced in discovery; is that correct?

5    A    They were recently produced as a result of these motions,

6    within the last couple days.

7    Q    Okay.

8         Produced to the U.S. attorney's office, correct?

9    A    Yes.  Just today, yes.

10   Q    Okay.

11        Now, when we talk about the substances that you were

12   investigating in this case during your involvement in it,

13   you're referring to these as licit pharmaceuticals, correct?

14   A    Correct.

15   Q    L-I-C-I-T, is that the correct spelling?

16   A    I'm not in --

17   Q    Okay.

18   A    There may be two Ls.

19   Q    Legal drugs?

20   A    Yes, ma'am.

21   Q    As opposed to illegal substances such as marijuana,

22   cocaine, of that nature?

23   A    Schedule I, yes.

24   Q    Okay.

25        And you have experience in this matter since 2009; is

Tyler Brown - Cross

1  that correct?  Was I understanding --

2  A    No, no, actually since 2005.

3  Q    And is that when you first became an agent?

4  A    Diversion investigator.

5  Q    Okay.

6          And in that capacity, you simply look at the, the

7  distribution of these various licit substances in the medical

8  profession; is that correct?

9  A    Not really.  Actually, the role of a diversion investigator

10  is both on a regulatory and criminal investigations.

11  Q    Okay.

12          And when you say "criminal investigation," are you

13  referring to the type of investigation here that results in the

14  Government arresting individuals and charging them with

15  offense --

16  A    Yes.

17  Q    -- such as in this matter?

18  A    Yes.

19  Q    Okay.

20          Now, Investigator -- and am I referring to him

21  correctly, Investigator Bruce or Agent Bruce?

22  A    Investigator.

23  Q    Okay.

24          He had the case before you and actually was the person

25  who started everything; is that fair to say?

1  A   Yes.

2  Q   Yes.

3         And so he's the individual that opened the file and

4  determined that Ms. Hee and various other individuals would be

5  the target of your agency; is that --

6  A   Yes.

7  Q   -- is that correct?

8         And when Agent Bruce left his capacity as the lead

9  agent in this case, did he turn over to you all of his

10  materials?

11  A   Yes.

12  Q   Okay.

13         And did those include surveillance, notes, things of

14  that nature?

15  A   Reports.

16  Q   Reports.

17         And was he also involved in the various, what you

18  refer to with Government counsel as the undercover buys?

19  A   Yes.  He was.

20  Q   Okay.

21         And those buys actually, from what you have reviewed,

22  started back sometime in 2008; is that fair to say?

23  A   Yes.

24  Q   Okay.

25         Around July of 2008?

1   A    No.

2   Q    No?

3          I'm sorry, that -- I misspoke with respect to that

4   date.  What time in 2008 did all of this commence?

5   A    I believe roughly May of 2008.

6   Q    Okay.

7          And at that time wasn't the Government targeting

8   Ms. Hee's then husband, Michael Hee?

9   A    Actually, that was not a DEA case.

10  Q    Okay.

11         But the government, your agency was aware that that

12  was an investigation that was going on, wasn't it?

13  A    I can't speak to that.  I wasn't even in the Denver office,

14  ma'am.

15  Q    Okay.

16         But since becoming involved with this case as the lead

17  agent, you have had an opportunity to review all of the

18  materials that have gone into bringing this prosecution, have

19  you not?

20  A    Yes.

21  Q    And part of that, those materials, include surveillance

22  records, correct?

23  A    Yes.

24  Q    And surveillance video?

25  A    Yes.

Tyler Brown – Cross

1   Q   And surveillance audio?

2   A   Yes.

3   Q   And much of that audio indicates that the Denver police

4   detective who was posing as the undercover in the various

5   transactions was looking to get to Michael Hee, correct?

6   A   I, I don't recall that specifically.

7   Q   Okay.

8        Well, have you listened to all of the audiotapes in

9   connection with this investigation?

10  A   The majority of them, yes.

11  Q   Okay.

12       And on some of those tapes, Detective Huskey is asking

13  Ms. Hee about her husband, Michael; isn't that correct?

14  A   I'm not sure.  I'd have to go back and review.  It's been a

15  while.

16  Q   Let's talk about your role as the leader, the case agent.

17       You indicated that you make operational decisions in

18  that capacity?

19  A   Correct.

20  Q   And could you describe for me what that means; what's an

21  operational decision?

22  A   Well, it can mean anything.  If we want to go do a

23  surveillance operation one day or attempt to make an undercover

24  purchase another day to, you know, try to obtain further

25  evidence from pharmacies.  Just what we decide to do to further

Tyler Brown - Cross

1    the investigation.

2    Q    Okay.

3         And that was something that as soon as you got

4    transferred into this role that you're in in this case, you

5    started doing right away; is that fair to say?

6    A    Yes.

7    Q    Okay.

8         You started directing traffic, for lack of a better

9    term?

10   A    Yeah.

11   Q    And you were the captain of the ship of what was going to

12   happen next during the investigation?

13   A    Sure.

14   Q    And as part of that investigation, there were a series of

15   undercover buys that were conducted with Ms. Hee and other

16   individuals.  Is that right?

17   A    Majority of undercover buys were conducted prior to my

18   taking over the case.

19   Q    Okay.

20        And those undercover buys were conducted and it was

21   clear, was it not, that law enforcement had evidence to arrest

22   Ms. Hee.

23   A    Yes.

24   Q    Back in July of 2008.

25   A    I believe the buys began roughly May.

Tyler Brown - Cross

1    Q    Okay.

2         As far as back as May?

3    A    Yes.

4    Q    And the buys continued up through late fall of 2008,

5    correct?

6    A    Correct.

7    Q    Buys continued even after law enforcement was aware of

8    various deaths of individuals associated with Miss Hee, as you

9    refer to it.

10   A    Yes, ma'am.

11   Q    And these transactions continued after law enforcement was

12   aware of individual physicians that were prescribing the drugs,

13   correct?

14   A    Correct.

15   Q    Such as Nicole Hoffman?

16   A    Yes.

17   Q    And I believe you mentioned the Dr. Benoist?

18   A    Yes.

19   Q    Is that B-E-N-O-I-S-T?

20   A    Yes, ma'am.

21   Q    Okay.

22        And at some point, law enforcement actually had

23   recruited Eleanor Wilfley, who you refer to as Ali, to work

24   with it, correct?

25   A    Ali Wilfley?

Tyler Brown – Cross

1  Q    Correct.

2  A    Recruited Ali Wilfley?

3         I'm not following you, ma'am.

4  Q    Okay.

5         Well, Miss Wilfley was arrested, was she not, or

6  stopped in a vehicle sometime in 2009?

7  A    I don't recall.  I'd have to review the reports again.

8  Q    Okay.

9         Well, maybe if we take a break, you can do that.

10         I'm sorry, I misspoke of the name.  Joslyn Torres.

11 A   Yes, ma'am.

12 Q    Okay.

13         And so Ms. Torres was actually cooperating with you

14 folks and providing information?

15 A    Initially, yes.

16 Q    Okay.

17         And you had information then that you could have gone

18 in and done something to prevent this activity from continuing

19 further.

20 A    Yes.

21 Q    But you didn't do that.

22 A    No, we were trying to continue to further the

23 investigation.

24 Q    Well, you knew where the drugs were coming from, in terms

25 of the pharmacies that were filling them, correct?

1    A    Yes.

2    Q    And you knew the doctors that were prescribing them because

3    you had the records that you subpoenaed from the Colorado state

4    Board of Pharmacy records, or I may be misstating what the name

5    is; is that right?

6    A    Yes.

7    Q    And so you had the information about source and people who

8    were, were the recipients of these, these drugs; is that right?

9    A    Yes.  Yes.

10   Q    Okay.

11        Now, let's talk about the information that you've

12   talked about today, provided today, in connection with

13   Ms. Phillips' death, okay?

14        You entered -- or not you, your fellow officers

15   interviewed Ms. Phillips' sister; is that correct?

16   A    Yes.

17   Q    And her name is Andrea Green.

18   A    Yes.

19   Q    Okay.

20        And you've had a chance to review those reports of

21   that interview?

22   A    Yes.

23   Q    Prior to testifying the first time at the very first

24   detention hearing; is that right?

25   A    I don't recall when.  Prior to the initial arrest, yes.

Tyler Brown - Cross

1  Q   And did you review them in connection with your testimony

2  here today?

3  A   No.  I did not.  I just reviewed the motion submitted by

4  the Government.

5  Q   Okay.

6       Now, the Government -- and you, in responding to

7  questions asked of you on direct, agreed that what is stated

8  factually in the Government's response that has been filed is

9  in fact what your view of the facts are.

10 A   Yes.

11 Q   Is that fair to say?

12      Okay.

13      And the Government has provided information that -- in

14 that response that Ms. Green told law-enforcement officers that

15 Katina Phillips' death was linked to Leslie.  Who ran a drug

16 ring.

17 A   Was linked to Leslie, yes.

18 Q   Okay.

19      And she didn't say a Leslie Hee.

20 A   No, she --

21 Q   She didn't use the name "Leslie Hee"?

22 A   I don't believe she did.

23 Q   And she in fact did not know Miss Hee?

24 A   I don't know if she did or not.  She didn't state one way

25 or the other.

Tyler Brown - Cross

1  Q   Okay.

2       You've read that report at some point, correct?

3  A   Correct.

4  Q   And you've read the Government's response?

5  A   Yes.

6  Q   And the Government's response indicates that Leslie,

7  referred to as Leslie Hee, was someone who later became known

8  to Ms. Green.

9  A   I don't recall one way or the other, ma'am.

10 Q   Okay.

11      And have you actually reviewed an autopsy report from

12 Ms. Phillips' death?

13 A   Yes.

14 Q   And that autopsy report is not something that has been

15 provided in discovery, has it?

16 A   I believe it had.  I'd have to review with the U.S.

17 attorney's office.

18 Q   And do you have in your training as a -- and I don't want

19 to misquote what you said it was -- either an agent or

20 diversion investigator, do you have specific training in the

21 various substances that you are investigating?

22 A   Yes.  Yes.  Schedule II through V substances, yes.

23 Q   Okay.

24      And does your training also include what a addiction,

25 addiction specialist would be able to recognize as what is a

1    lethal versus a nonlethal dose?

2    A   Generically we had training regarding that, but nothing

3    qualifying me as an expert by any means.

4    Q   And you do not have any medical training, as well?

5    A   No, I do not.

6    Q   Now, the connection that you make between the death of

7    Ms. Phillips and Ms. Hee basically comes from what you've read

8    in the reports about statements by various family members of

9    Ms. Phillips; is that correct?

10   A   Yes, as well as the undercover deal on October 20, Anna

11   Wenter's discussion with Leslie Hee.

12   Q   Okay.

13           And the -- let's talk about that.  The undercover deal

14   on November -- I'm sorry, October 20.  That was actually four

15   days after Miss Phillips' death, correct?

16   A   Yeah, four or five days.

17   Q   And at that time you were not present because you hadn't

18   been involved in the investigation yet.

19   A   Correct.

20   Q   And that was a transaction or a, let's call it an event,

21   that was an event that occurred in a car in a Safeway parking

22   lot, correct?

23   A   Correct.

24   Q   And have you had a chance -- obviously you have re-reviewed

25   that tape since the Government initially filed its response --

1    A    Yes.

2    Q    -- that is the subject of this hearing.

3         Okay.

4         And that tape, in fact, consists of approximately an

5    hour of taped recording, correct?

6    A    Roughly, yes, ma'am.

7    Q    And a good part of that, probably half of it, is simply

8    Detective Huskey in his car speaking to his fellow agents every

9    once in a while and listening to the radio, correct?

10   A    It might be.  I skipped to the, to the section where it was

11   a discussion with Leslie Hee once they met.

12   Q    Okay.

13        And that discussion actually doesn't commence until

14   approximately 30, 38 minutes, 30, between 35 and 38 minutes

15   into the tape.

16   A    Okay.

17   Q    Is that right?  Did you agree with that?

18   A    I can't say for sure on that time span.

19   Q    All right.

20        And the purpose of that meeting, from what you could

21   hear Detective Huskey talking about and from your conversations

22   with him, was so that he could reconnect with Ms. Hee?

23   A    Correct.

24   Q    He hadn't had any contact with her for a few months.

25   A    Correct.

Tyler Brown - Cross

1  Q   And as he approaches or as they realize that they're both

2  in the same location and who's in what car and they connect,

3  Anna, Anna Wenter, actually arrives at the same time, does she

4  not?

5  A   Detective Huskey was in the vehicle prior to Anna Wenter.

6  Q   And within a few seconds, if not 30 seconds to a minute,

7  Anna Wenter was in the car?

8  A   I don't recall the exact timing, ma'am.

9  Q   And the discussion that you've corrected here today is --

10 reflects that Ms. Hee was not cold or callous about what she

11 had heard about Ms. Phillips.

12 A   There was discussion about Katina and how, yeah, she had

13 some affection for Katina, yes.

14 Q   And at some point during the discussion that occurs when

15 Detective Huskey and Anna are in the car with Ms. Hee, Anna

16 gets out of the car.  And leaves.

17 A   Correct.

18 Q   She wasn't crying during the conversation.

19 A   I don't know.  I couldn't hear one way or the other.

20 Q   Okay.

21      She was actually expressing her own concern about

22 Ms. Phillips' ex-husband and what he was going to do to her;

23 isn't that accurate?

24 A   There were concerns about statements made by, by, by her

25 ex-husband, correct.

Tyler Brown - Cross

1   Q   Let's talk about Jeremiha Bennett.  You've reviewed all the

2   information associated with that individual, correct?

3   A   Related to the Government's motion.

4   Q   Okay.

5       Well, when you say "related to the Government's

6   motion," is it correct for me to assume that you have reviewed

7   the discovery that's been produced in this case?

8   A   I don't know if I reviewed every single piece of discovery

9   related to Mr. Bennett, but I did review prescription records

10  and a report regarding him.

11  Q   And did you also review the autopsy of Mr. Bennett?

12  A   I did not, no.

13  Q   Okay.

14      Well, you agreed with the Government's statement that,

15  that Mr. Bennett, the -- quoting from the response, the drugs

16  in Mr. Bennett's system at the time of death included opiates,

17  cocaine -- I'm not even going to try to pronounce the next

18  word; I'll spell it for the court reporter,

19  B-E-N-Z-O-D-I-A-Z-E-P-I-N-E-S -- barbiturates, cannaboids,

20  methadone, ethanol, amphetamines, and other substances.  You

21  agreed here in court with that statement?

22  A   Correct.  I read the toxicology report, not the autopsy.

23  Q   Okay.

24      The toxicology report is actually a part -- there are

25  toxicology records as part of the autopsy.  I want to make sure

1    that we're referring to the same thing.

2              MS. ESKESEN:  If I may have a moment, Your Honor.

3              THE COURT:  Yes.

4              MS. ESKESEN:  Your Honor, may I approach the

5    witness --

6              THE COURT:  Yes.

7              MS. ESKESEN:  -- or have the witness handed some

8    discovery pages.  So we can make sure we're all talking about

9    the same thing?

10   BY MS. ESKESEN:

11   Q   You've been handed some discovery that's identified as LH

12   underscore DEA underscore INV underscore 588 through 594.

13             If you could take a look at that.  That's what I'm

14   referring to --

15   A   Yes, I have --

16   Q   Okay.

17   A   When you said "autopsy," I assumed the further details

18   going over the sections of the body and so forth.

19   Q   Okay.

20   A   But I have reviewed the toxicology section of the autopsy

21   report, yes.

22   Q   Okay.

23             So we're talking about the same document?

24   A   Yes.

25   Q   And I'm not confused.  Okay.

Tyler Brown - Cross

1      And what the Government says in its response that you

2   just agreed with me is actually something that you believe that

3   is contained in this report; is that correct?

4   A    Yes.

5   Q    In other words, what Mr. Bennett had in his system at the

6   time of his death, correct?

7   A    Yes.

8   Q    Okay.

9      Could actually take a look on page 588, which is

10  the -- and I call it 588, it's all the other prefixes I don't

11  think we need to repeat here -- and look at the bottom down

12  there where it says "toxicology."

13  A    Okay.

14  Q    And you're basing your conclusion on what's, what's set

15  forth in this toxicology section, correct?

16  A    Yes.

17  Q    Okay.

18      And if you can follow with me where it says, urine,

19  drug screen, by enzyme immunoassay.  It says opiates, cocaine

20  slash metabolites, benzodiazepines, cannabinoids, barbiturates,

21  methadone, phen -- P-H-E-N-C-Y-C-L-I-D-I-N-E, and propoxyphene.

22  And it says "none detected"?

23  A    Correct.

24  Q    And so that means that there were none of those substances

25  present in Mr. Bennett's system?

Tyler Brown - Cross

1   A    Yes.  I was mistaken, it was just the fentanyl and MDMA.

2   Q    Okay.

3        And then the Government's response also indicates that

4   there were pill bottles found on a table that bore Dr. Nicole

5   Hoffman's name?

6   A    Correct.

7   Q    Okay.

8        And that was something that you got from reviewing the

9   Denver police officer's reports?

10  A    Correct, yes.

11  Q    And those reports, you've reviewed these as well, correct?

12  A    Yes.

13  Q    Okay.

14       Those reports fail to reveal to whom the prescriptions

15  were made, correct?

16  A    I don't recall one way or the other, ma'am.

17  Q    Okay.

18       In other words, we know that Dr. Hoffman prescribed

19  the substances that were identified on these pill bottles.

20  A    Yes.

21  Q    But we don't know who she provided the prescription to.

22  A    Well, I can say that I reviewed Mr. Bennett's prescription

23  records, and he did have prescriptions from Dr. Hoffman.

24  Q    Okay.

25       And you also know from what you've reviewed from this

1   investigation that although Jeremiha Bennett was living at the

2   house where Leslie Hee lived, that he was not an associate of

3   hers.

4   A   Well, from the report, based on the report reviewed from

5   Denver police, he was, he was living there.

6           Other than that, I can't speak beyond that.

7   Q   And he was from out of state, correct?

8   A   That, I don't recall.

9   Q   And he had a criminal record.

10  A   I don't recall his criminal record, ma'am.

11  Q   Would that be something that you would be interested in, if

12  you're looking at individuals who are allegedly associated with

13  a drug ring?

14  A   Yes, ma'am.

15  Q   And if you could review the autopsy report a little further

16  and look at page 590, under the section that says "history."

17          It indicates there, does it not, that Mr. Bennett had

18  a intra, I-N-T-R-A, cardiac shunt, S-H-U-N-T.

19          Do you see that?

20  A   I don't see where --

21  Q   Okay.

22          Under the history says, towards the bottom of the

23  paragraph, the sentence that begins, A remote echocardiogram.

24  A   Uh-huh.

25  Q   Okay.

Tyler Brown - Cross

1          Realizing that neither of us are medical

2    professionals, that indicates that there was something going on

3    with his heart, correct?

4    A    I'm not a physician, but --

5    Q    Okay.

6          So you can't say for certain here that Mr. Bennett's

7    death is directly related to Leslie Hee.

8    A    Well, based on the evidence, it certainly is related, based

9    on the prescription records and him being in the home.

10   Q    Okay.

11         And that's what you base your conclusion on.

12   A    And the autopsy report, yes.

13   Q    Okay.

14         The autopsy report that indicates that all of these

15   substances that you've said were present in his body were

16   actually not detected.

17   A    Well, as I clarified before, the fentanyl and the Ecstasy.

18   Q    Okay.

19         Did you have an opportunity to obtain and do any

20   further analysis with respect to any of the fluids or matters

21   that are retained when an autopsy is conducted?

22   A    Again, I can't speak to that as far as what the previous

23   case agent did.  But I have -- I didn't do anything of that

24   nature, no.

25   Q    Okay.

1        Now, you also have adopted, by indicating that the

2   Government's response is correct, various statements concerning

3   when and who received prescriptions; is that right?

4   A    Yes.

5   Q    Okay.

6        And that's based on having issued an administrative

7   subpoena to the state of Colorado where they maintain

8   pharmaceutical records so that you can look and see who got

9   what prescriptions when?

10  A    Yes, ma'am.

11  Q    Okay.

12       And the records that you did subpoena, were you

13  actually the one who did subpoena those?

14  A    No, ma'am.

15  Q    Okay.

16       So that was your previous fellow agent?

17  A    Case agent or intelligence analyst.

18  Q    Okay.

19       And you've had a chance, obviously, to review all of

20  those?

21  A    At some point in the investigation, yes.

22  Q    Okay.

23       And the records were requested for a very discrete

24  period during the course of the investigation.

25       Is that correct?

1  A    I can't specifically state.  There were numerous subpoenas

2  sent out, and so I can't state as far as specifically what each

3  individual subpoena was for.

4  Q    Okay.

5         And when you say numerous subpoenas being sent out,

6  numerous subpoenas to the Colorado --

7  A    Board of Pharmacy, yes.

8  Q    Board -- what is it called?

9  A    The Colorado Board of Pharmacy.

10 Q    Okay.

11        And is that -- the records that have been provided by

12 GHS, Gould Health Systems, are those what are produced by the

13 Colorado Board of Pharmacy?

14 A    Yes.  I believe that's actually the contractor that

15 processes the data for the Board of Pharmacy.

16 Q    Okay.

17        So it's all from the same place, correct?

18 A    Correct.

19 Q    And in reviewing all of those records, you made a

20 conclusion that Ms. Hee filled prescriptions for -- or received

21 prescriptions for narcotics from Dr. Hoffman around the date of

22 Katina Phillips' death in October.

23 A    Correct.  Yes.

24 Q    And you've had a chance to review those records for today?

25 A    Yes.

Tyler Brown - Cross

1   Q   'Cause we talked about that.

2         Okay.

3         Those records actually reveal this Ms. Hee filled

4   prescriptions in month of September 2008.  Correct?

5   A   Yes.

6   Q   Approximately three weeks before Ms. Phillips' death?

7   A   I don't recall the exact date.

8   Q   Okay.

9         And those records also reveal that she filled

10  prescriptions for Oxycontin and fentanyl after her death.

11  A   That Miss Hee filled --

12  Q   Yes.

13  A   Yes.

14  Q   On October 17 and October 22.

15  A   Her prescriptions continued after the death, yes.

16  Q   So those prescriptions that were filled after death had no

17  bearing whatsoever on death, correct?

18  A   Well, she was already dead, so.

19  Q   And you have no evidence that the substances that

20  Ms. Phillips had ingested came from Ms. Hee.

21  A   Correct.

22  Q   Okay.

23        In fact, when law enforcement arrived at Ms. Phillips'

24  apartment, Benjamin Draughon was there.

25  A   Draughon.

Tyler Brown - Cross

1   Q   I don't know how to pronounce it.  I think it's Draughon, I

2   don't know.

3           MS. ESKESEN:  Does the reporter need spellings?

4   BY MS. ESKESEN:

5   Q   He was there?

6   A   Correct.

7   Q   He's actually the one who called for assistance, because

8   he's the one who discovered that she was unconscious?

9   A   Correct.

10  Q   And he also had a history of prescriptions.

11  A   Yes.

12  Q   And he had prescriptions there that night.

13  A   He did, yes.

14  Q   And had admitted that he had given some of his

15  prescriptions to Ms. Phillips?

16  A   I don't recall him admitting giving some prescriptions to

17  her.

18  Q   Well, he said they were partying together that evening, did

19  he not?

20  A   He did, yes.

21  Q   Yeah.

22          And shortly before Mr. Draughon's discovery of Katina

23  Phillips, she had been in contact with her friend Anna Wenter.

24  A   That, I don't recall, ma'am.

25  Q   Now, you were aware, were you not, that Ms. Phillips,

Tyler Brown - Cross

54

1  herself, had some history with prescription drugs.

2  A   Yes, ma'am.

3  Q   Prior to Ms. Hee.

4  A   Yes.

5  Q   Okay.

6       And you learned that by reviewing the reports of

7  interviews with her estranged husband, correct?

8  A   I don't recall which specific report, but I do recall the

9  information, yes.

10 Q   And had you had an opportunity to go review court records

11 to see if Miss Phillips had her own legal issues?

12 A   I don't recall personally doing that, but I believe another

13 agent had mentioned that to me.

14 Q   Okay.

15      And would you agree that Ms. Phillips, at the time of

16 her unfortunate death, had been on a deferred judgment and

17 sentence out of the Arapahoe County, Colorado district court?

18 A   She did.  She did have a history.  I don't recall the

19 specific judgment.

20 Q   Okay.

21      And one of the conditions of her sentence was that she

22 have alcohol and drug evaluation and treatment.

23 A   That sounds correct, yes.

24 Q   You also knew, did you not, that Ms. Phillips had suffered

25 a previous overdose.  At some time prior to her relationship

Tyler Brown - Cross

1    with Ms. Hee.

2    A    I don't recall that specifically, no.

3    Q    Now, were you involved in the arrest of Ms. Hee on May 5?

4    A    Yes, I planned the operation.

5    Q    Okay.

6           Were you actually present when she was stopped by law

7    enforcement and taken into custody?

8    A    I was not, no.

9    Q    Okay.

10          But you've spoken with the other law-enforcement

11   officers who were involved in that.

12   A    Yes.

13   Q    Okay.

14          And you learned what transpired, correct?

15   A    Yes.

16   Q    And when she was stopped and arrested, Ms. Hee was

17   cooperative.  Was she not?

18   A    As far as she didn't fight or anything like that, if that's

19   what you're inferring.

20   Q    She didn't fight?

21   A    She didn't fight against law enforcement.

22   Q    Okay.

23   A    No.

24   Q    She didn't struggle.

25   A    Correct.

Tyler Brown - Cross

1    Q    Okay.

2          And she didn't flee?

3    A    No, she did not.

4    Q    She went willingly with you?

5    A    Yes.

6    Q    And she didn't have any weapons.

7    A    She did not.

8    Q    Now, let's talk about your -- what has transpired, I guess,

9    since the first detention hearing.  It sounds like you had the

10   interview with Ms. Wilfley's folks; is that correct?

11   A    Yes.

12   Q    Okay.

13         That was actually -- if you can clarify for me.  Was

14   that after the hearing was convened or --

15   A    It was after the hearing, yes.

16   Q    Okay.

17         So after the Government had already presented its case

18   and given evidence, you learned this new information?

19   A    Well, this -- you're messing things up.  This was the first

20   meeting, the first detention hearing date, and it was actually

21   continued.  Into a later date.

22   Q    Okay.

23   A    So Miss Hee's actual detention hearing where I testified

24   was after the interview.

25   Q    Okay.

Tyler Brown - Cross

1        So just to get the sequence of events correct, since I

2   wasn't, I wasn't counsel of record during that time, Ms. Hee

3   was arrested on May 5.

4   A   Yes.

5   Q   Is that right?

6        And she made an initial appearance before Magistrate

7   Judge Boland on May 6.

8   A   Yes.

9   Q   Is that correct?

10        Were you at all these court --

11  A   I was not at the initial one.

12  Q   Okay.

13        But did you learn about what transpired at these

14  various hearings?

15  A   I spoke briefly with AUSA regarding the case, yes.

16  Q   Okay.

17        And at her first appearance, did you learn that the

18  case was scheduled for a later detention hearing and an

19  arraignment and discovery conference?

20  A   Yes.

21  Q   Okay.

22        And she had indicated that she was going to hire her

23  own attorney?

24  A   I don't know that information, ma'am.

25  Q   Okay.

Tyler Brown - Cross

1        And then were you present at the hearing that had been

2   scheduled for detention on May 11, 2011; is that the one that

3   you're referring to?

4   A   I'm not sure if that's the correct day.  But it was the

5   first -- in early May, it was the first scheduled hearing.

6   Q   Okay.

7        And if it -- would it sound familiar to you if it was

8   about May 17, when she asked for -- when she was represented by

9   counsel and that lawyer asked for a continuance?

10  A   Roughly, yes.

11  Q   Okay.

12       And that's about the time that you spoke with the

13  Wilfley clan.

14  A   Yes, in May.

15  Q   And you spoke with the mom and the dad.

16       And was Ali Wilfley present?

17  A   No, she was not.

18  Q   Okay.

19       She was in custody at the time, correct?

20  A   Correct.

21  Q   And the parents, from what I understand from your

22  testimony, they, they approached you folks; is that fair to

23  say?

24  A   It was an arrangement made between a defense counsel and

25  AUSA Menendez.

Tyler Brown - Cross

1   Q   Okay.

2           And at that point would you agree that those folks

3   wanted to do whatever they could to help their daughter.

4   A   They just wanted to tell us the truth is what she stated to

5   me.

6   Q   Okay.

7           And they wanted to help their daughter?

8   A   I can't speak to the motivations.

9   Q   Okay.

10          Well, their daughter was in custody, wasn't she?

11  A   She was.

12  Q   And in your experience as an agent, you deal with various

13  family members, do you not?

14  A   Yes.

15  Q   And when family members have other family members that are

16  in custody, they don't really think that's a great thing, do

17  they?

18          MS. MENENDEZ:  I object.  Calls for speculation.

19          THE COURT:  Sustained.

20  BY MS. ESKESEN:

21  Q   The Wilfleys were not happy, were they, from what you could

22  tell?

23  A   As a matter of fact, it was the opposite.  They felt like

24  their daughter's drug problem was so bad that the only way to

25  save her was for her to be arrested.

Tyler Brown - Cross

1  Q    Okay.

2         She had had a drug problem for quite some time.

3  A    Yes, ma'am.

4  Q    And you obtained records related to her prescription-drug

5  consumption, if you will, as part of your investigation in this

6  case.

7  A    The records have been previously obtained.

8  Q    Okay.

9         And those records focused on a specific period of time

10 during what is alleged to be the course of the conspiracy in

11 this case.

12 A    Correct.

13 Q    In other words, we don't have records from years ago that

14 we would be able to look at and say various individuals were

15 consuming all sorts of drugs?

16 A    2008 was the beginning of the investigation.

17 Q    Okay.

18        So you don't have information about anything that went

19 on before then.

20 A    No, I don't.

21 Q    All right.

22        So it's possible, is it not, that some of these people

23 were actually addicted to various substances prior to ever

24 coming into contact with Ms. Hee?

25 A    Yes, it is possible.

1           MS. ESKESEN:  May I have one moment, Your Honor?

2           THE COURT:  Yes.

3           MS. ESKESEN:  Your Honor, if I can just one second to

4  make sure --

5           THE COURT:  Yes.

6           MS. ESKESEN:  -- I've covered everything I want to

7  cover.

8           Your Honor, that's all I have at this time.

9           THE COURT:  Thank you.

10          Any redirect?

11          MS. MENENDEZ:  Yes, Your Honor.

12          MS. ESKESEN:  Your Honor, may I retrieve the -- does

13  he need the report that had --

14          MS. MENENDEZ:  If we can leave it there for just a

15  second.

16          MS. ESKESEN:  All right.

17          MS. MENENDEZ:  Thank you.

18          Your Honor, can I ask Ms. Bush to come and present the

19  Government's Exhibit 2, which I will show to Miss Eskesen, to

20  the --

21          THE COURT:  Yes.

22          MS. MENENDEZ:  Okay.

23          And, Your Honor, I'm just going to ask a little bit of

24  latitude because I made a mistake that I never want my witness

25  to be given or to pay for, because it's mine.

**REDIRECT EXAMINATION**

BY MS. MENENDEZ:

Q   You've just been handed a document, sir, that says, Autopsy report Jeremiha Bennett, correct?

A   Correct.

Q   Okay.

        And we've never cleared up, for the court reporter, Jeremiha is J-E-R-E-M-I-H-A, correct?

A   Correct.

Q   Now, that document that I've just handed you is the one that Miss Eskesen asked you about, correct?

A   Correct.

Q   About all the drugs in his system?

A   Yes.

Q   Okay.

        And when -- is the -- when did you get Government's response to -- for your review?

A   I believe it was late last week.

Q   And in fact, was there a conversation about whether you got a final review before I hit "send"?

A   You mean final draft?

Q   Yes.

A   I never received a final draft.

Q   Okay.

        And when you were asked -- when I asked you whether

Tyler Brown - Redirect

1  you agreed about the drug in Jeremiha Bennett's system and you

2  agreed, had you had the chance to pull out that autopsy report

3  and that toxicology report and compare it before I hit "send"?

4  A   No, I did not.

5  Q   Okay.

6        And in fact, when I asked you whether you agreed, that

7  was a leading question, that was my mistake, not yours,

8  correct?

9  A   Yes.

10  Q   Okay.

11        Is there anything else you want to tell the Court

12  about not having that be a willful mistake on your part,

13  because I need to sleep tonight.

14  A   No, I --

15        MS. ESKESEN:  Your Honor, we'll stipulate.

16        THE WITNESS:  It was fentanyl and MDMA.

17        MS. MENENDEZ:  If Miss Eskesen stipulated, so I will

18  sleep tonight; and thank you, very much, Miss Eskesen.

19        MS. ESKESEN:  That's fine.

20        MS. MENENDEZ:  Thank you.  Now I only have two

21  questions, and they're easy.

22  BY MS. MENENDEZ:

23  Q   We've talked about notes you produced?

24  A   Yes, ma'am.

25  Q   And I'm holding two pages that I picked up off our table,

Tyler Brown – Redirect

1    correct?

2    A    Yes.

3    Q    And you created this, right?

4    A    Yes, ma'am.

5    Q    Why?

6    A    Just to kind of help myself with the Government, synopsize

7    the Government's response essentially for my testimony today.

8    Q    Okay.

9         Is it your work product that comes from the review of

10   the discovery?

11   A    It was primarily off of that and the discovery.  Primarily

12   off the Government's response and the discovery.

13   Q    And I think you said you produced it to us.  You haven't

14   actually given us a copy 'cause it's yours, right?

15   A    Correct.  I just showed up with it today.

16   Q    My last question is this.  I think Miss Eskesen asked you

17   about Special Agent Bruce and the undercover buys?

18   A    Yes.

19   Q    Was he ever directly involved in an undercover buy with

20   Miss Hee?

21   A    He was not.  He wasn't ever the undercover, no.  What I was

22   relating to was that he was actually, you know, involved in the

23   planning and carrying out of those operations.

24   Q    Okay.  I'm quitting while I'm ahead.

25         Thank you, sir.

 1          THE COURT:  That's it?

 2          MS. MENENDEZ:  That's it.

 3          THE COURT:  All right.  Thank you very much.

 4          MS. MENENDEZ:  Thank you, Miss Eskesen.

 5          THE COURT:  Anything further?

 6          MS. MENENDEZ:  No, sir.

 7          THE COURT:  Anything?

 8          MS. ESKESEN:  Your Honor, I don't have any witnesses

 9   to present.

10          THE COURT:  Okay.

11          MS. ESKESEN:  I simply have some things I'd like to

12   add as far as argument.

13          THE COURT:  All right.

14          MS. ESKESEN:  So I don't have anything to present.

15          THE COURT:  Let's proceed.  I still think it's best to

16   proceed with the Government first.

17          MS. MENENDEZ:  May Special Agent Brown --

18          THE COURT:  Yes, he may stand down, please.

19          MS. ESKESEN:  Can I have my autopsy report?

20          THE WITNESS:  Yes, ma'am.

21          MS. ESKESEN:  Thank you.

22          MS. MENENDEZ:  Your Honor, my argument will be brief.

23          I have briefed on behalf of the Government, as well as

24   I can, and I produced documents that will speak for themselves

25   and the Court will make conclusions accordingly.

1        I would highlight from the Government's response and

2   from the pretrial services report of which the Court has taken

3   judicial notice that there is a rebuttable presumption in this

4   case and that under 3142(f)(1)(C), subject to rebuttal by the

5   person, it shall be presumed that no condition or combination

6   of conditions will reasonably assure the appearance of the

7   person as required.  As I said at the detention hearing, we

8   don't have an issue with appearance that I can see.

9        But we do have a concern over the safety of the

10  community and so there's no condition that -- or combination of

11  conditions that will reasonably assure the appearance of the

12  person as required, and safety of community.  If the judicial

13  officer finds that there's probable cause to believe that a

14  crime has been committed.  And this is clearly an offense for

15  which the maximum term of imprisonment is ten years or more.

16  The indictment will present the Government's probable cause

17  that several of these counts took place in a school zone, which

18  increases the potential penalty that the Court can choose to

19  impose, although it doesn't necessarily increase the statutory

20  maximum and we are aware of that.

21       Seems to me as the best argument that I can make is

22  the one that I presented to Magistrate Judge Tafoya and so I

23  will say it again.  We normally deal with methamphetamine and

24  cocaine and heroin.  In this case is different because the

25  instrumentalities of the crime were possessed by Miss Hee.  And

1    she spread those instrumentalities of crime to people who were

2    vulnerable, people who were young, people who were susceptible

3    to purses and fancy things and big houses and cars.

4           And she -- we're not here today to say that the drugs

5    that she handed them are the ones that went into these people's

6    system and killed them.  What we are here to do, to say today

7    is that in April of 2008 this defendant had someone die in the

8    chair at her house from an overdose.  She continued to

9    distribute pharmaceuticals, she continued to prey on young

10   people.  Katina Phillips died in October of 2008.  October 16.

11   On October 20, there is a recording of her giving four

12   Oxycontin to one of the 20-year-olds in this drug ring and

13   saying we'll talk about the rest of it at the house later.

14          Miss Hee is not a potential danger to the community;

15   she has shown what a danger she is to the community.  We have

16   parents who tell us that in 2009 she had some part in leaving a

17   young woman who was overdosed in the back yard drooling.  I, I

18   can't think of anybody that I've dealt with in the recent past,

19   and possibly in the history of my career, who presents a more

20   serious and grave threat to the community than this woman

21   sitting at this table, Leslie Hee.  And I would ask the Court

22   to determine that the order of detention was correctly entered

23   and to keep it in place.

24          Thank you.

25          THE COURT:  Thank you.

1          MS. ESKESEN:  Thank you, Your Honor.

2          First of all, Your Honor, I would like to preface what

3     I have to say with just the comment that I am in no way by

4     making the arguments that I'm making on behalf of Ms. Hee

5     trying to denigrate or somehow minimize the effect to any

6     individuals that may be in the courtroom concerning individuals

7     who have died as a result of things that were discovered during

8     this investigation.  That, that simply is not my intent.

9          But what I do intend to do is ensure that the law is

10    complied with with respect to matters that need to be addressed

11    by a court with, in connection with the Government's motion to

12    continue to detain Ms. Hee or the original motion and the

13    magistrate judge's ruling.

14          As I stated in the motion that I filed to revoke the

15    magistrate judge's detention order, what I am concerned with

16    the most is that it would appear that the magistrate judge

17    initially concluded that Ms. Hee is in fact a risk of flight

18    and a danger to the community.  And what we are finding here is

19    that she is not a risk of flight and what the Government

20    appears to be saying the main issue is the danger to the

21    community, which I will in fact address.

22          What I have concerns about as well is the fact that

23    the United States probation office, which conducted a very

24    detailed and thoughtful investigation and made recommendations

25    which are contrary to what the Government wants, has not even

been mentioned in connection with the Government's argument

with this hearing.  The probation department is in the best

position to make the types of assessments.  That's why the

Court relies on the probation department.  And in this

particular case, given the presumption and given the

circumstances and facts which are set forth in the bail report,

the probation department determined that there is a combination

of conditions that could be imposed to reasonably assure the

safety of the community and to assure that Ms. Hee will attend

future court proceedings.

I ask the Court, then, to adopt the report with

respect to those particular findings.  One thing that's

different now, as I mentioned in my motion, is that given the

passage of time, Ms. Hee no longer has her residence and the

things that would have been in place at the time if, if her

release had been granted in May; and what we have done is we've

suggested to the Court that an alternative which I believe is a

reasonable alternative, given the probation department's

recommendation, is that she go to a halfway house.

With all of this discussion about her being such a

danger and the availability of the licit prescription drugs,

that that is something that could be monitored by both the

probation department and a halfway house.  I know from

experience that defendants who are placed in the halfway house

pending trial that have medical needs and have prescription

1    drugs, they don't get to have those and just run around Denver

2    while they're at the halfway house and do what they want with

3    those prescriptions, they are actually maintained and

4    administered by the halfway house.

5        So I believe in terms of the, the fear that the

6    Government may have that Ms. Hee is going to get out and go

7    fill prescriptions and distribute prescriptions is simply

8    something that can be controlled by letting her out and having

9    her in a setting where someone is monitoring all of that.

10       A couple of other things that I wanted to address

11   before I finish my argument because they, they are in

12   connection with the various filings the Government has made,

13   including its response and its motion to seal the response and

14   its brief in support of the motion to seal.  The defense has no

15   objection whatsoever to the sealing of these various documents.

16   I will leave it the Court's discretion as to whether or not

17   they should be sealed.

18       I tend to disagree with the Government as far as

19   grounds for the sealing.  The grounds as stated in document

20   no. 153 is that the defendant may attempt to flee if notified

21   in advance of the warrant.  I believe that may be a typo by the

22   U.S. attorney's office, simply using a brief in support of a

23   motion to seal for an arrest warrant.

24       With that said, I know that the Court is not in favor

25   of sealing various documents and we certainly have no

1    objection, but we'll leave it to the Court.

2            In connection with Government's Exhibit No. 2,

3    attached to its response, which is at docket no. 151, the

4    document that the Government has provided to the Court is not

5    the same version of the document that has been provided to the

6    defense.  The Government has redacted a paragraph in that

7    particular document; and that paragraph indicates that the

8    law-enforcement officers that arrived at the Hee residence at

9    14 -- I'm sorry; let me get the address -- 1405 South Clayton,

10   in response to the call about Jeremiha Bennett had actually

11   spoken with Michael Hee, defendant's husband, who is now in

12   custody in the federal Bureau of Prisons, and investigated

13   further in the car belonging to Jeremiha Bennett and located

14   marijuana and semiautomatic handgun.

15           I'm not sure why the Government redacted that

16   provision, but I believe that it's appropriate for the Court to

17   have the entire document or at least knowledge of the entire

18   document.

19           With respect to the prescription records that the

20   Government has attached as its exhibit number -- or in support

21   of its fact no. 6, those records do speak for themselves.  I am

22   not going to say anything further other than all of these

23   individuals that were obtaining prescription drugs had their

24   own prescriptions, obviously, and had their own dealings with

25   doctors, primarily Dr. Hoffman, which I think if the Court has

1  concerns about the safety of the community, it might be

2  wondering why Dr. Hoffman is out there prescribing these very

3  dangerous, licit substances at such a frequent basis to all of

4  these individuals.  And I don't say that in order to minimize

5  anything having to do with Ms. Hee, but that certainly is a

6  factor with respect to the whole "safety of the community"

7  question.

8           And I, Your Honor, am not privy to what the government

9  does and its decision, but am certainly wondering about what

10 the status of Dr. Hoffman is.

11          Your Honor, what I would like the Court also to accept

12 to make its own judgment and I can provide to the Court after I

13 have Mr. Armistead help me here, is the actual recording, the

14 KEL recording from the October 20, 2008 transaction that has

15 been testified to here regarding Ms. Hee's response when

16 Detective Huskey was in the car and there were discussions

17 regarding the death of Ms. Phillips.  I think the Court is

18 probably in the best position to weigh those facts and

19 determine what it thinks as far as what occurred on that date.

20 One thing that was not addressed during the testimony is that

21 there was no particular transaction that actually occurred

22 between Ms. Hee and Detective Huskey on that date.

23          Your Honor, I think bottom line what I'd like the

24 Court to understand where we're coming from is that with the

25 Bail Reform Act, pretrial release is, as a defense attorney

1   would say, is to be the norm.  That is something that we look

2   to do with a defendant unless all of these other conditions

3   that are provided for under the Bail Reform Act are made.

4         And I think that the -- this is demonstrated by the

5   order of preference that release and detention is set forth in

6   the statute itself.  Because if you look at the various

7   subsections under title 18 U.S.C. 3142, the first provision is

8   that the Court should look to release the defendant on a PR or

9   an unsecured bond.  That's subsection B.  The second thing the

10  Court should look to is release on condition or combination of

11  conditions.  That's section -- subsection C.  And then there's

12  the provision about, the third provision about temporary

13  detention to permit revocation of conditional release,

14  deportation, et cetera, which is provided for in subsection D.

15  And then as the last resort, as the fourth option, pretrial

16  detention, which is under subsection E.

17        Here, we suggest to the Court that there are adequate

18  alternatives to incarceration that would assure that Ms. Hee

19  will appear at court appearances in the future and would also

20  minimize any perceived threat to the community.  As I said

21  before, a halfway house could control her movement.  It can

22  administer prescriptions if she is legally and has a physical

23  entitlement to various prescriptions.  And a setting like that

24  is certainly going to be more restrictive than releasing her to

25  her home, which is what was contemplated at the time of the

1    hearing before Magistrate Judge Tafoya, with an ankle bracelet.

2           And so, Your Honor, based on what the Court has heard

3    here today and what's presented in the papers, we would ask the

4    Court to revoke the magistrate judge's detention order and

5    order that Ms. Hee be released on conditions.

6           THE COURT:  Thank you very much.

7           Anything else?

8           MS. MENENDEZ:  May I speak from here, Your Honor?

9           THE COURT:  Speak up.  I'm hard of hearing.

10          MS. MENENDEZ:  The Government has no objection to the

11   entirety of that page concerning Jeremiha Bennett.  The

12   redaction was done because there was an indication that Michael

13   Hee was involved with a gun.  That is Leslie Hee's husband.

14   This isn't about Michael Hee.  This case is about Leslie Hee,

15   and we didn't want to make any inference, bad-guy inference,

16   because of a gun associated with her husband.  If they want the

17   entirety of the page to go back, we have no objection.

18          THE COURT:  Okay.

19          That it?

20          MS. MENENDEZ:  That's it.

21          THE COURT:  The first thing is the motion to seal is

22   denied.  I don't favor those.  I keep telling counsel,

23   particularly the Government, that this is not the CIA.  This is

24   an open court, and unless it's specifically directed for a

25   significant reason, then I will not do them in what I consider

1  to be routine matters.

2          The next thing is that, I think that Magistrate

3  Judge Tafoya had it right and I'm not going to grant this

4  motion.  The risk of flight is not really an issue here, and it

5  wasn't in front of her, as I see it.  But what's really at

6  issue here is that there is a presumption that no condition

7  or -- a statutory concern that no condition or combination of

8  conditions can ensure the safety of the community, and this

9  transcript is replete with indications that this particular

10  defendant recruited the most vulnerable of people to engage in

11  the sale of these drugs, only licit when actually prescribed,

12  and then sometimes not licit, depending upon the volume of

13  prescription.

14          I am somewhat taken by Miss Eskesen's comment about

15  Dr. Nicole Hoffman.  I am curious about that, too, but the fact

16  is she's not in front of me.  It's not my concern as a judge.

17  I am concerned about safety of the community with doctors

18  engaged in that activity.  But I am not here to determine that.

19          I'm here to determine safety of the community with

20  respect to this particular defendant.  And to me it is not a

21  question of her use of these drugs; it is not a question of her

22  personally selling them.  It's a question, which could be

23  perhaps, with less restrictive or invasive measures such as the

24  probation department recommended, ankle bracelet, halfway house

25  and so forth, if this were a case of where we were worried

about somebody being prevented from engaging in sales on a

direct basis, I would probably be persuaded.  But I'm not

persuaded with regard to this because of the contact with other

people and the ability that is apparent from this record of

inveigling other people to engage in this activity, people who

are vulnerable.  And the young woman who was staying at her

house and then dumped unceremoniously in her parents' back yard

and the statement is uncontradicted and I think in fact

corroborated that she had been staying with Miss Hee presents

another danger.

Another danger which wasn't brought up today but which

concerns me greatly about the danger to the community and the

safety of the community is the fact that sales occurred greater

than a thousand feet of West High School.  And I have a perhaps

Machiavellian interpretation of that, because the sales weren't

within 1,000 feet of a school, it's a pretty good place because

you're not as likely to be detected there, there's too much

reliance upon it.  But nevertheless sales took place.

So I am not satisfied that there's sufficient evidence

nor do I have confidence in measures that would be sufficient

to overcome the statutory presumption, and therefore I deny the

motion for revocation of the detention order and the defendant

will be remanded.

MS. ESKESEN:  Your Honor, may I address one thing?

THE COURT:  Yes.

1          MS. ESKESEN:  And I'm not arguing with Your Honor

2     about this.

3          THE COURT:  I know.

4          MS. ESKESEN:  I just simply wanted to raise one thing

5     with respect to the motion to seal and the Government's filing.

6          I respect and understand the Court's ruling.  I do

7     think that under the electronic, whatever, the acts that --

8     there are medical records in there with identifying information

9     that I don't believe are appropriately public documents.

10          THE COURT:  They can be redacted on the specific

11     basis.

12          MS. ESKESEN:  Okay.

13          THE COURT:  But that's not the motion that I have in

14     front of me.  There's a tendency to just try to seal

15     everything, and that's what I oppose.

16          MS. ESKESEN:  I will get with Government counsel and

17     address that, Your Honor.

18          THE COURT:  You want to keep that, that's fine.

19          MS. ESKESEN:  All right.

20          Thank you.

21          THE COURT:  All right.

22          We used to have newspapers in this community and there

23     was a reason, perhaps, for keeping some things from the press,

24     but that is an illusion anymore.  Nobody covers the courts.

25     But if you want to seal specific names, I can understand that.

1   Deal with that.

2           All right.  We'll be in recess.

3           Thank you.

4           Wait a minute, I'm being overruled.

5           There's two motions to seal, I'm told.

6           THE COURTROOM DEPUTY:  Your Honor, my specific request

7   is that they just put on the record which document number

8   they're talking about.

9           THE COURT:  Good.

10          MS. MENENDEZ:  Your Honor, at this time the Government

11  would, based on the Court's findings, we will move to withdraw

12  the motions to seal.

13          THE COURT:  Okay.

14          MS. MENENDEZ:  And if we may advise Miss Bush after

15  the proceeding as to what those docket numbers are,

16  Miss Eskesen has told me she believes they're 152 and 154, but

17  I would like a moment to confer.

18          THE COURT:  All right.  Why don't you check and see

19  and whatever they are, we'll make that order.

20          Is that all right, Miss Bush?

21          THE COURTROOM DEPUTY:  Yes, Your Honor.  Thank you.

22          THE COURT:  Thank you.

23      (Recess at 3:52 p.m.)

24                      REPORTER'S CERTIFICATE

25          I certify that the foregoing is a correct transcript

1   from the record of proceedings in the above-entitled matter.

2   Dated at Denver, Colorado, this 6th day of September, 2011.

3

4                                    s/Kara Spitler_____
                                          Kara Spitler
5   WITNESSES

6       TYLER BROWN

7           Direct Examination By Ms. Menendez          4

8           Cross-examination By Ms. Eskesen           29

9           Redirect Examination By Ms. Menendez       62

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25